Nott, J.,
delivered the opinion of the court:
These cases, which have been brought under the French spoliation act of 1885, are very extraordinary, being for the seizure of American property on neutral territory by a belligerent not at war with the "United States. Their history we take from the argument of the claimant’s counsel.
“ In 1796 the city of Leghorn was a part of the Grand Duchy of Tuscany. War was being waged on Italian soil between *234 tlie armies of France and Austria and her Italian allies, but Tuscany was neutral. A state of war existed between England and France. The immediate circumstances attendant upon the seizure of Leghorn are stated by a well-known historian as follows:
“ ‘ Having arranged this important treaty (with the Pope), Napoleon without delay crossed the Apennines, and found the division of Vaubois at Pistoia. From that point he detached Murat, who suddenly descended upon Leghorn, and seized the effects of a large i>ortion of the English merchants, which were sold in open violation of all the usages of war, which hitherto had respected private property on land, and from their sale he realized twelve millions of francs for the use of the army. What rendered this outrage more flagrant was that it was committed in the territories of a neutral power, the Grand Duke of Tuscany, and from whom he himself at the time was getting the most splendid reception at Florence.” (3 Allison’s History of Europe, p. 31.) 1
“ ‘If our administrative conduct,” said Napoleon to the Directory, “was detestable at Leghorn, our political conduct towards Tuscany was no better.” (Secret Correspondence of Napoleon, 11th July, 1796. Ibid., note p. 32.
“ The firm of Earle, Hodgson & Drake, in whose warehouse the goods and merchandise of Henry Phillips and other American citizens were stored, was an English house, and the seizure was made under the preteuse that the goods were English property. The French proclamation contained the following extraordinary language:
“ ‘ The intention of the general in chief is that all the enemy’s property should be delivered to the Eepublie as prizes made at sea.’
To this should be added that a long correspondence was carried on between the American consul and the French commissioners, in which the former claimed that his own warehouse should be considered as a ship under the American flag exempt from search and seizure. Great reliance apparently has been placed on this position of the consul; but as the goods of these American claimants were not in his warehouse his demand for exemption from search does not affect or benefit them. Their goods at the time were in the warehouses of Earle, Hodgson & Drake, an English house, and concerning their goods the consul conceded: “I confess that it is necessary to exhibit proofs to claim this property. The note sworn before me by the attorney of Messrs. Earle & Co., of which I gave you a copy, wants nothing to establish a plain proof but to be compared with the books of the merchants. These books *235 being in yonr bands, yon can not accuse me of making ill-founded demands.”
Tbe French commissioners did not concede tbat tbe proofs were sufficient, and replied to tbe consul: “ You may be sure tbat tbe agents of tbe Eepublic will be as exact to give back to tbe neutrals all tbat will be proved belonging to them as not to let escape tbe property we are intrusted witb.”
Tbe correspondence involved other matters and tbe rights of other parties, and it does not appear tbat there was an im-equivocable refusal to give up tbe goods at any time. But it is certain tbat they were not given up, tbat they were sold at auction witb tbe English property in tbe same warehouse, and tbat tbe owners ultimately preferred claims for payment under tbe treaty of 1803. Those claims were rejected on tbe following ground:
“In pursuance of tbe rule of proceeding adopted on tbe 15 th of May last (vide, p. 164 of this register), tbe board having fully examined tbe documents and vouchers regularly certilied to them in the five cases above specified (not found upon tbe “conjectural note”), and which are to be considered as part of this record, and having duly attended to all tbe proofs produced in relation to them, are of opinion tbat such claims respectively are excluded from tbe benefit of tbe convention of • the 30th of April, 1803, between tbe United States and France, and ought not to be certified for liquidation to the French bureau.”
It can not be denied tbat this invasion of neutral territory and seizure of neutral property was a lawless outrage, and it must be conceded tbat tbe conduct of tbe French agents was specious, evasive, false, and rapacious. But tbe question in these cases is whether these seizures are of those classes for which tbe United States have become responsible.
When an American merchant places bis goods on an American ship they do not lose their nationality because she leaves port. An American vessel on tbe high seas is in contemplation of law American territory. Tbe obligation of the Government to protect tbe property of tbe citizen, varied but unimpaired, remains. Every government owes protection from foreign aggression to tbe person and property of every citizen. So long as be and bis goods remain under tbe American flag it is immaterial whether it waves on land or sea.
*236 But when au American merchant carries Ms sMp into a foreign port and unloads Ms goods and places them under tlie protection of a foreign power, the obligation of Ms own Government is to see that be receives from the other the full measure of protection which it accords to its own citizens. If he should subsequently meet with losses or misfortunes, and the foreign power in which he has confided should be unable to afford protection or obtain redress, those disappointments will be chances which he was bound to consider in limine, risks incident to the transaction.
It is true that the political arm of the American Government might have taken hold of this matter, but it might have done so though no American citizen had lost a dollar’s worth of property. Great national considerations can not depend upon the rights or wrongs of individuals. All the neutral nations of the world might well have made common cause with the Duke of Tuscany in demanding reparation or declaring war. It is also true that when a weak power like Tuscany is utterly unable to afford protection or demand redress against a great power like France, a strong obligation will rest on the American Government to overlook the intermediate nation and demand redress from the wrongdoer; but ordinarily the obligation to afford protection or demand redress rests on the other government, the government which was immediately charged with the duty of protection; and there is a great difference in the nature and measure of the obligation when the wrongful act was committed on American territory or under the American flag, and when it was committed upon the territory and under the flag of another nation.
Six years after these Leghorn seizures the Governments of France and America were still negotiating concerning their demands against each other. On the part of France there was a great claim strictly national, i. e., a demand for redress for acts and omissions of the American Government prejudicial to France as a nation; on the part of the United States there were many private claims, i. e., a demand for redress for the wrongs and injuries done to the commerce of their citizens. In this controversy France acknowledged an obligation to make indemnity, the amount being unascertained, while the United States denied obligation growing out of their national policy, but nevertheless offered to pay 12,000,000 francs to be re *237 lieved from tbe demand. After years of irritating and unavailing attempts to settle tbeir differences Napoleon’s insight perceived that the American Government was weary of its unavailing efforts to procure a settlement, and with characteristic shrewdness and readiness he proposed to get rid of the liability of France by setting off the one demand against the other aad entering into a mutual renunciation of both.
But in the year 1800 there were many other American claims which were not so relinquished, and which consequently did not enter into and become a part of the consideration which the United States gave to France in exchange for the release which France gave to the United States. The claims which constituted that consideration, and which consequently form the basis of the Government’s liability to its own citizens, as this court has held, were only the claims embraced in the second article of the treaty of 1800. (Gray’s Case, 21 C. Cls. R., 340; Cushing’s Case, 22 id., 1.)
These claims are alluded to, but not defined, in the second article. They are spoken of in very general terms as the indemnities “mutually due or claimed, on the part of France under the treaty of alliance of 1778, and on the part of the United States under the treaty of amity and commerce of the same date. But the fifth article provides for debts “ contracted by one of the two nations with individuals of the other,” which it declares “shall be paid” “in the same manner as if there had been no misunderstanding between the two States,” with the proviso added: “But this clause shall not extend to indemnities claimed on account of captures or confiscation.” In other words, there were then before the high contracting parties two classes of claims, the one of which was designated by the general term of “indemnities,” and the other by the general term of “debts;” the former were mutually relinquished, that is to say, exchanged, and the latter were declared to be still binding and obligatory.
After a brief interval those “debts,” recognized as obligatory by the fifth article, were again the subject of negotiation between the two governments, and by the treaty of 1803, article IV, a fund was provided for the payment of them, with, however, qualifications that they should be debts “due to citizens of the United States who have been and are yet creditors of France;” that they should be debts “the payment of which *238 bas been heretofore claimed of the actual Government of France;” that they should be debts “for which the creditors have a right to the protection of the United States.” The claimants in the present cases, as previously stated, went before the board of commissioners under the treaty of 1803 in the character of creditors, and presented their demands as debts, and the board rejected them, upon the ground that they were “excluded from the benefit of the convention of the 30th April, 1803, and ought not to be certified for liquidation to the French bureau.” The reasons for this exclusion are not given. • It may have been because, in the opinion of the board, they came under the head of “indemnities” instead of under the head of ‘ ‘ debts; ” it may have been because they were regarded as debts for which the creditors had not a right to the protection of the United States.
Let it be assumed, however, that they were rejected by the board upon the ground that they were not debts, within the intent of the fifth article of the treaty of 1800, which had been “ contracted by one of the two nations with individuals of the other” — by France with citizens of the United States. The question then recurs whether they were claims for “indemnity” within the intent of the second article, which the American Government was bound to prosecute, which it had prosecuted, and by the extinguishment of which it then acquired an extinguishment of its own liability to France.
The claimants’ cases are exceedingly hard cases, but they are also, it is believed, distinctive and peculiar. No other instances have been brought to the attention of the court in all of our trouble with the French Republic of land captures ’ on neutral territory by military force. The American Government was not to blame in the matter nor in anyway chargeable with the offense. Its Army and Navy were not bound to defend Tuscany, nor to protect the claimants’ property in a foreign country; and no liability can be cast upon it unless it took these claims, expressly or by reasonable implication, and released them for its own benefit, leaving the claimants without redress against either Tuscany or France. It therefore seems but reasonable that if the claimants would establish that liability they must show either that their claims come within the general demands for indemnity which the Government constantly pressed in the negotiations that' ended in *239 tbe second article of tbe treaty of 1800, or tbat these Leghorn seizures were expressly brought to the attention of the French Government with a demand for indemnity on behalf of the individual owners. As to the second alternative, it may here be said that no demand or complaint was made by the United States which the evidence discloses, and that in all of the voluminous instructions and correspondence relating to French spoliations which have been before the court in other cases we have not observed a single reference to the Leghorn seizures. The question then is, whether they were, if not expressly, by reasonable implication within the demands for indemnity which the United States made upon France.
The subjects of diplomatic complaint between 1793 and 1800 were the French statutory decrees impairing the rights of neutral commerce on the high seas, the capture of American merchantmen by French cruisers, and the unjust and lawless condemnations of American vessels and imprisonment of American seamen by French tribunals. The decree of May 15,1791, inhibited Americans from “introducing, selling, and arming their vessels” in French ports and from “enjoying all the advantages allowed to those built in the shipyards of the Republic;” the decree May 9, 1793, ordered the arrest of neutral vessels laden with provisions bound for an enemy’s port; the decree of February 1,1797, subjected neutral vessels to capture and confiscation if merely cleared for certain ports in the West India Islands; the decree of March 2,1797, made the absence of a crew list, the “ role Wequipage,” a ground of condemnation; the decree of January 18,1798, made the carrying of British merchandise a ground of condemnation of a neutral vessel; all of these decrees, in a word, related to navigation and neutral commerce under its own flag and on the sea.
The American legislation during the same period related to the same subjects, referring in terms to the rights of neutral commerce on the sea, coupled with the “national rights and sovereignty” of the United States. The Act 28th May, 1798 (1 Stat. L., p. 561), recites that “armed vessels sailing under authority or pretense of authority from the Republic of France have committed depredations on the commerce of the United States, and have recently captured the vessels and property of citizens thereof.” The Act 13th June, 1798 (ib., p. 565), forbids the vessels of the United States to enter French ports *240 and tbe vessels of France to enter American ports nntil tbe Government of France and all persons acting nnder its authority “ shall be found to refrain from tbe aggressions, depredations, and hostilities which have been and are by them encouraged and maintained against the vessels and other property of the citizens of the United States and against their national rights and sovereignty.” The Act 7th July, 1798 (ib., p. 578), declares that “there is yet pursued against the United States a system of predatory violence,infracting the said treaties, and hostile to the rights of a free and independent nation.” The Act 9th July, 1798 (ib., p. 578), authorizes the capture of armed French vessels and their condemnation and forfeiture, and provides for the restoration of American property found on captured ships. All of these statutes are silent as to French aggressions on foreign soil, as to land captures on neutral territory, and as to the infraction of the national rights and sovereignty of other neutral powers.
The diplomatic correspondence by which we apprised France of our demands for indemnity follows the same lines, and does not, that we have observed, go beyond them. The brief but comprehensive, summary given by our brother Davis in the leading case of Gray (21 C. Cls. R., 361) sets forth substantially the whole of the American demands as they were presented to France.
“We complained of spoliation and maltreatment of our vessels at sea, losses by the embargo at Bordeaux, nonpayment of drafts by the colonial administration, seizure or cargoes of vessels, nonperformance of contracts by Government agents, condemnation of vessels and their cargoes in violation of the treaties of 1778, and captures under the decree of 1793.”
The court is not unmindful of the assurance (likewise pressed by counsel upon our attention) which Mr. Jefferson gave to the merchants of the United States wherein it is said he made no distinction between injuries done to American citizens on land and sea:
“I have it in charge from the President to assure the merchants of the United States concerned in foreign commerce or navigation that due attention will be paid to any injuries they may suffer on the high seas or in foreign countries contrary to the law of nations or to existing treaties, and that on the forwarding hither of well-authenticated evidence of the same, proper proceedings will be adopted for their relief.” (2 Wharton’s Dig., sec. 228.)
*241 But all that this letter really promises is “clue attention” and “proper proceedings,” and concerning it it must be beld, first, that “proper proceedings” upon claims of this character would be the pressing of a remonstrance upon either Tuscany or France; and, seeond, that Mr. Jefferson’s letter was written long before these claims existed. It may be considered a pledge or promise to American citizens, yet it can not be treated as if it were a specific recognition of these claims on the part of the Government, and the avowal of an intent to press them against the French Republic and demand indemnity on behalf of these citizens.
As the Leghorn seizures have been likened to a seizure of neutral property on belligerent territory, and it has been claimed that the right to indemnity is indeed stronger in cases like the present, where “ the property of a neutral has been confiscated in the territory of another neutral,” the court will declare briefly the principles which it deems applicable to seizures on land.
When a nation is at peace, it owes protection of person and property to all who are allowed to come within its territory, whether they are citizens or aliens. When war comes and the neutral becomes a belligerent, the obligation to protect, as against the acts of the other belligerent, ceases equally in the case of either a citizen or an alien; both must bear the hazards of war. Conversely, however, the right of the alien’s own government to speak for him in a measure revives, and it may demand redress for the seizure and user or for the wanton destruction of his property by either belligerent.
Applied to the case before us, these principles mean this: Tuscany being neutral territory, the United States owed only a qualified protection to the alien, though their citizen, who had voluntarily carried his goods there, and as against France could not be called upon to interfere, unless they deemed the circumstances such as justified them in going behind Tuscany and calling the real wrongdoer to account. If Tuscany had then been belligerent territory, she would not have owed protection to this property as against France, and the duty which the United States owed to their citizens would have been to interfere and demand indemnity for the user or wanton destruction of American property by France, though upon enemy’s territory.
*242 It appears iu tbe correspondence of tbe American consul at Leg'llorn, before cited, tbat when tbe French army descended npon tbat city a proclamation was issued likening tbe seizure of English property to prizes made at sea. Tbe proclamation is not before us, but we will assume tbat tbe brief quotation made by tbe consul is correct: “The intention of tbe general in chief is tbat all tbe enemy’s property should be delivered to tbe Republic as prizes made at sea.” Tbe consul himself adroitly sought to take advantage of tbat expression by claiming tbat bis own warehouse should be regarded as a ship under tbe American flag, exempt from search by tbe terms of tbe treaty of amity and commerce 1778, and be accordingly addressed tbe following memorial to tbe French authorities:
“ The consul of the United States of America in Tuscany to the cirv. salicite commissary of the Trench Government for the army of Italy, greeting :
“ Tbe consul-general of tbe French Eepublie having declared by bis proclamation tbat tbe goods belonging to tbe enemies of tbe Republic were to be delivered to him as prizes made at sea, and tbe twenty-third article of tbe treaty of friendship and trade between the French Republic and tbe United States positively says tbat the respective ships will secure tbe liberty of merchandises; tbat all tbe goods found on board of any of tbe ships belonging to tbe subjects of one of those governments will be declared free, though tbe cargoes on board should belong to tbe enemies of one of them, the undersigned thinks that be is authorized to ask tbat bis magazines should be considered as ships carrying tbe American flag. He hopes that his demand will be received with goodness, tbat protection will be granted to him in his quality of consul for a Republic which has been a friend of France since the beginning of her revolution.”
On the argument this idea has been carried further, and tbe claimants have contended tbat tbe warehouse of tbe English merchants Earle, Hodgson & Drake should be regarded as an English ship upon tbe high seas, and tbe neutral property on board of her as exempt from seizure and condemnation.
Tbe proclamation of tbe French general and the subsequent correspondence of tbe French officials indicate tbat tbe intention was: First, tbat English warehouses should be seized; second, tbat English goods in neutral warehouses should be seized; third, tbat neutral property wherever situated should be restored or paid for. Tbe last intent, unhappily, seems never to have been carried into effect.
*243 But this rule for conducting these seizures on land could not change the character of the transaction, nor affect the relations of the three powers, nor transmute the neutral territory into the high seas, nor make it subject to . maritime law. Neither does the proclamation assume to do so. It does not speak of neutral property, nor assure neutrals of maritime rights; it begins and ends with English property, which it declares shall ic be delivered up as prizes made at sea; ” i. e., as we understand it, the inhabitants of Leghorn should deliver up English property in their possession just as a neutral vessel on the high seas could be required to stop and surrender her English cargo. The act of seizure continued to be an invasion of neutral territory, the Tuscan Government continued to owe the owners protection, and the United States continued to be irresponsible for the wrong.
The terms of the jurisdictional act have been pressed upon the court as indicative of a legislative intent that the court should assume jurisdiction of these land captures, and do justice to these suffering American claimants; and there are words and phrases in the statute broad enough to sustain such a jurisdiction. Here, however, the question is not one of jurisdiction, but of liability. There were many classes of claimants before Congress seeking redress for French spoliations. As to some of them the legislative discretion refused judicial redress by expressly withholding jurisdiction of claims which were embraced in the treaty 1803, or were allowed and paid under the treaty with Spain 1819, or were allowed under the treaty with France 1831. As to others, arising under the second article of the treaty 1800, Congress have conceded that the claimants may come into this court and have the question of liability determined, and have conceded nothing more.
The conclusion of the court is that the claimants are not entitled to indemnity against the United States; and the order of the court is that they be so reported to Congress, together with this opinion.