Peelle, J.,
delivered the opinion of the court:
This action is prosecuted under the act of January 29,1885 (23 Stat. L., 283), known as the French spoliation act, the first, or jurisdictional, section of which reads:
“Be it enacted, etc. (section 1), That such citizens of the United States, or their legal representatives, as had valid claims to indemnity upon the French Government arising out of illegal captures, detentions, seizures, condemnations, and confiscations prior to the ratification of the convention between the United States and the French Republic concluded on the thirtieth day of September, eighteen hundred, the ratifications of which were exchanged on the thirty-first day of July following, may apply to the Court of Claims, within two years from the passage of this act, as hereinafter provided:
“Provided, That the provisions of this act shall not extend to such claims as were embraced in the convention between *417 tbe United States and the .French Republic on the thirtieth day of April, eighteen hundred and three;
“Nor to such claims growing out of the acts of France as were allowed and paid, in whole or in part, under the provisions of the treaty between the United States and Spain concluded on the twenty-second day of February, eighteen hundred and nineteen;
“Nor to such claims as were allowed, in whole or in part, under the provisions of the treaty between the United States and France concluded on the fourth day of July, eighteen hundred and thirty-one. * * * ”
The ship Apollo, as disclosed by the findings, was captured by the French privateer L’Aventure and taken into Rivadeo, Spain, where, in October, 1798, the vessel and cargo were condemned by the French consul holding a prize court at Corunna, Spain, as a good prize and ordered sold.
The decree of condemnation was affirmed by the civil tribunal at Nantes, but prior thereto, and at or about the time of the original condemnation at Corunna, the ship and cargo had been delivered by the court to the owner of the privateer and he had sold the ship and shipped the cargo to Bayonne and there sold it.
An appeal was taken from the civil tribunal at Nantes to the council of prizes, where the case was pending at the time of the convention between the Republic of France and the United States, concluded September 30, 1800. (Public Treaties of the United States, p. 225.)
In November following, and before the exchange of ratifications of the treaty aforesaid, the decree of condemnation was reversed and restitution of the. vessel and cargo was ordered, but in the meantime, as before stated, the vessel and cargo had been sold, and in addition thereto the vessel had been partially burned in tarring, and thus had become valueless.
The origin, history, and diplomatic character of the claims asserted by the United States and the Republic of France against each other are fully set forth in the opinion of this court in the case of the schooner Sally, Russell, master (21 C. Cls. R., p. 340), and in the case of the ship Tom, Baily, master (29 C. Cls. R., p. 68), and need not be repeated here *418 further than may be necessary to a right understanding of the questions involved in this case.
At the time of the convention between the two Governments the differences which the ministers plenipotentiary were unable to conclude or settle were expressed in the second article of the treaty in these words:
“The ministers plenipotentiary of the two parties not being able to agree at present respecting the treaty of alliance of 6th February, 1778, the treaty of amity and commerce of the same date, and the convention of the 14th of November, 1788, nor upon the indemnities mutually due or claimed, the parties will negotiate further on these subjects at a convenient time, and until they may have agreed upon these points the said treaties and convention shall have no operation and the relations of the two countries shall be regulated as follows:” * * *
On the part of France it was claimed that the United States had violated their obligations imposed by the stipulations contained in the treaties there named, out of which arose the public claim she asserted against the United States.
On the part of the United States they were asserting the claims of individual citizens of the United States to indemnities for property sold and lost to the owners by reason of illegal prizes made by French privateers and condemned by .French prize courts.
At the time of the exchange of ratifications of the treaty as stated in the opinion in the case of the ship Tom (supra), a supplemental clause was appended to the treaty by the first consul of France, which was approved and accepted by the United States, which in substance provided that the second article of the treaty should be retrenched, and that bjr this retrenchment the indemnities due or claimed by the United States were relinquished and released to France, in consideration of which France relinquished and released the national or public claim to indemnity she held or claimed against the United States.
This mutual relinquishment, it was held in the case of the schooner Sally (supra), constituted the bargain by the treaty of 1800 and brings the claims to “indemnity” within that provision of the Constitution which provides that “private *419 property shall not be taken for public use without just compensation.”
The claim, then, which the citizen presents, under the act of our jurisdiction, must be a “valid claim to indemnity upon the Trench Government arising out of illegal captures, detentions, seizures, condemnations, and confiscations prior to the ratification of the convention” — i. e., prior to July 31, 1801; and it must be a claim which the United States appropriated by their relinquishment and release to France by the retrenchment of article 2 of that treaty.
Another class of claims is embraced in article 4 of the same treaty, which reads: '
“Property captured and not yet definitively condemned, or which may be captured before the exchange of ratifications (contraband goods destined to an enemy’s port excepted), shall be mutually restored on the following proofs of ownership, viz: The proof on both sides with respect to merchant ships, whether armed or unarmed, shall be a passport in the following form:
* _ * * * *
“This article shall take effect from the date of the signature of the present convention. And if, from the date of said signature, any property shall be condemned contrary to the said convention before the knowledge of this stipulation shall be obtained, the property so condemned shall, without delay, be restored or paid for.” (Public Treaties of the United States, 715.)
Still a third class, designated as “the debts contracted,” is embraced in article 5, not, however, extending “to indemnities claimed on account of captures and confiscations,” and need not be further considered here in our view of this case.
On the part of the defendants it is contended that the claims in suit arose under article 4 for the restitution of “property captured and not yet definitively condemned ” when the treaty was signed; that if the property captured was lost to the owners and restitution in kind became impossible, France was bound under the rules of law, international and municipal, to make restitution by a money equivalent.
Furthermore, the defendants contend that by the provisions of article 9 of the convention with Spain, concluded *420 February 22,1819 (Public Treaties of the United States, 1873, p. 715), the United States elected to look to Spain, one of the tort feasors, for “all claims on account of prizes made by French privateers and condemned by French consuls within the territory and jurisdiction of Spain.”
On the part of the claimant it is contended that inasmuch as the property in this case was illegally captured, condemned, and sold, and, in fact, lost to the owners prior to the signatures to the treaty of 1800, a claim to indemnity thereby arose which was released to France by the retrenchment of article 2.
At the time of signing the treaty the liability of France to indemnity, which is essential in these cases to fix the liability of the United States, was not complete, as at that time, although the vessel and cargo had been condemned and ordered sold, and the decree had been affirmed by the civil tribunal at Nantes, such condemnation was not definitive, as a substantial right of appeal existed of which the master of the vessel, as he was bound to do, had availed himself, seeking a reversal of the decree by the council of prizes. The schooner Peggy (1 Cranch, 103). The ship Tom (29 C. Cls. E., pp. 68-96).
He continued the prosecution of his appeal, and the decree of condemnation was thereafter, and before the exchange of ratifications, reversed and restitution of the property was ordered, but restitution in kind being impossible, as then disclosed, the master of the vessel sought restitution for a money equivalent against the captor, and succeeded in getting a judg ment or decree for the value or partial value of the cargo after the, exchange of ratifications of the treaty of 1800, but in the meantime the captor had become insolvent and only a small portion of the decree was paid.
What became of the bond presumably given by the captor when the property ordered sold was delivered to him, and why the full amount of the decree was not paid, does not appear other than by the insolvency of the captor.
By article 5 of the treaty of 1803 (Pub. Treaties of the United States, p. 236), referring to the debts due from France to citizens of the United States contracted before the conven *421 tion of September 30,1800, and snob as were due for “prizes made at sea in which the appeal had been properly lodged,” it was provided: “The preceding articles shall apply only, 1st, to captures of which the council of prizes shall have ordered restitution, it being well understood that the claimant can not have recourse to the United States otherwise than he might have had to the Government of the French Republic, and only in case of insufficiency of the captors.” * * *
Thus, where the council of prizes had ordered property restored, as in the case at bar, and restitution of the property or a money equivalent failed by reason of the “ insufficiency of the captor,” France recognized her liability to make good such loss by a money equivalent; and such is the general rule. (Broom’s Legal Maxims, pp. 241,248.)
But in the present case the probability is that the insufficiency of the captor had. not been ascertained until after the expiration of the time provided for filing claims under the treaty; otherwise it is fair to presume that claims then fresh would have been filed if within its provisions.
If the claims had been released to France under the retrenchment of article 2 of the treaty of 1800, and thereby satisfied, certainly France would not, after the exchange of the ratifications of'the treaty, have permitted a decree in favor of the master of the vessel for the value of the cargo, on failure of restitution, to be rendered against the captor for whose illegal acts France was liable.
Therefore at the time of the signing of the treaty of 1800, as well as at the date of the exchange of ratifications thereof, the property captured, condemned, and sold could not legally have formed the basis of a claim to indemnity under article 2, even though such claims were not embraced in the treaty of 1819.
But assuming, as the claimants contend, that, by reason of the sale-.of the captured property and its consequent loss to the owners, “valid claims to indemnity thereby arose” prior to the ratification of the convention of 1800, for the payment of which France and Spain were liable as joint tortfeasors, and of which claims the court, under the act of 1885, acquires jurisdiction, still it does not follow that they were embraced *422 in the relinquishment to France by tbe retrenchment of article 2; and if not, then, although France and Spain were liable as joint tort feasors, no liability attached to the United States. (,Schooner Jane, Snow, master, 23 C. Cls. it., p. 226.)
This view is in harmony with the statement of the court in the first paragraph of the opinion in the case of the ship Tom {supra), where it was said: “Not all spoliation claims were so relinquished to France. Some were provided for, or intended to be provided for, by that or other treaties; some were exceptional claims, abandoned, intentionally or unintentionally, in the diplomatic vicissitudes of the time.” {The Leghorn Seizures, 27 C. Cls. R., 224.)
The claimants’ rights to indemnity under the act of 1885 depend not alone upon the illegal acts of French privateers and French prize courts, though those are conditions precedent, but upon the acts of the United States in relinquishing such claims to France; and such relinquishment can only be ascertained from the acts of the United States as disclosed in the treaties made by them in reference thereto.
In other words, except as limited by the proviso the liability of France and the consequent liability of the United States, if any exist, is to be determined as though the act of 1885 had never been passed.
Therefore, in respect of the claims in this action and like claims, let us see what was done .by the United States in their treaty with Spain in 1819.
By article 9 the United States renounced, among others, “all claims on account of prizes made by French privateers and condemned by French consuls within the territory and jurisdiction of Spain,” and by article 11 exonerated “Spain from all demands in future” on account thereof, “and considering them entirely cancelled,” agreed to make satisfaction thereof, together with other claims likewise renounced “ through an amount not exceeding five million dollars,” the ascertainment of the “ amount and validity” of which was to be made by a commission consisting of three commissioners, citizens of the United States, to be appointed by the President.
To assure Spain that the United States had not up to that time received any compensation from France growing out of *423 prizes made by French privateers, where the property so captured had been condemned by French consuls within the territory and jurisdiction of Spain, it was provided in article 14 of the treaty with Spain that “the United States hereby certify that they have not received any compensation from France for the injuries they suffered ” in consequence of such captures and condemnations; and, furthermore, that the United States would “present an authoritative statement of the prizes made and of their true value, that Spain may avail herself of the same in such a manner as she may deem just and proper.”
For the payment of the claims thus renounced the United States evidently looked to Spain, as primarily liable, because the captured property, while in her ports, was condemned by French consuls within her jurisdiction, of which proceedings she was bound to take notice.
In addition to the international obligation imposed upon Spain to protect the property of neutrals within her jurisdiction from such spoliations, she had* expressly stipulated to do so by article 6 of the treaty concluded on the 27th day of October, 1795 (Public Treaties of the United States, 706), which reads:
“Each party shall endeavor, by all means in their power, to protect and defend all vessels and other .effects belonging to the citizens or subjects of the other, which shall be within the extent of their jurisdiction by sea or by land, and shall use all their efforts to recover, and cause to be restored to the right owners, their vessels and effects«which may have been taken from them within the extent of their said jurisdiction, whether they are at war or not with the power whose subjects have taken possession of the said effects.”
Hence when Spain permitted the condemnation of the property of citizens of the United States by French consuls within her territory she thereby violated her treaty obligations and became primarily liable thereunder.
When the United States exacted of and stipulated with Spain for satisfaction of the claims so renounced, for the payment of which provision was made by the cession of Florida, as set forth in the treaty, they thereby released France and elected to look to Spain alone for the payment of such claims, *424 and by tbat act of the sovereign tbe citizen is bound. The ship Hope (27 C. Cls. R., 122, 128). .
When that treaty went into effect the claims renounced were transferred from the field of diplomacy to the domestic commission therein provided for, whose duty it was to “receive, examine, and decide upon the amount and validity of all the claims included within the description above mentioned.”
Before that tribunal the citizens of the United States holding claims of the description mentioned were given the opportunity of filing their claims and of having them examined and decided.
If they did so file their claims and they “were allowed and paid in whole or in part,” they are by the proviso in express terms excluded from our jurisdiction; and as to those filed which were disallowed or rejected on the merits, as was done in the present case in respect of the claim of James Sheafe, the owner of the vessel, this court in the case of the ship Hope (mprá) held that they were res judicata, and therefore barred. See also case of Meade v. United States (9 Wall., 691).
The proviso, as well as the whole act, must be construed with the treaties which form the basis of whatever liability attaches to the United States, and this is recognized in section 3 of the act.
Any construction of the language in the treaty of 1819 which would include the claims therein provided for as claims which were released to France under the treaty of 1800 would necessarily call in question the good faith of the United States, for by article 14 of the treaty of 1819 they expressly certify that they had not “received any compensation from France for the injuries they suffered from her privateers, consuls, and tribunals on the coasts and in the ports of Spain for the satisfaction of which provision” was made in that treaty; and if not, then of course such claims were not relinquished to France.
The word compensation as there used must be construed to mean that no consideration of any kind had passed from France to the United States for the injuries there stated.
If such claims had been released to France by the treaty of *425 1800 it would have been deception on the part of the United States to have certified to Spain that they had received no compensation from France for such injuries, and that we can not attribute to the United States nor to the treaty-making power.
Nor does the act of our jurisdiction — a purely remedial statute — permit the citizen to question the action of the Government in its method of settling these diplomatic claims, and thereby found a right to an allowance contrary to the provisions of the treaty of 1819.
The United States, by express terms therein, renounce “all claims on account of prizes made by French privateers and condemned by French consuls within the territory and jurisdiction of Spain ” and acknowledge satisfaction thereof.
The act neither creates nor assumes liability; nor does it in any way affect, modify, or amend the treaties relating to such claims. On the contrary, the proviso to section 3 of the act expressly states that the court “shall decide upon the validity of said claims according to the rules of law, municipal and international, and the treaties of the United States applicable to the same.” Hence it is manifest that what the Congress intended was that, in ascertaining “the validity of said claims” and the liability of the United States in respect thereof, the court should look to the provisions of such treaties and give full force and effect thereto.
The liability of France arose out of her violation of treaty obligations and international law, as construed and administered by her consular and prize courts and tribunals, while the liability of the United States to their citizens, dependent upon that of France, arose alone out of the provisions of their treaties with France in relation thereto; and by the provisions of such treaties the citizen is bound, especially as under neither treaty had he acquired any vested rights.
As against France and Spain such claims could only have been enforced “by our Government either by diplomacy or by war,” as ruled in the case of Blagge v. Balch (162 U. S., 439).
We therefore reach the conclusions:
1. Even if the claims in suit were claims to “indemnity” prior to the ratification of the convention of 1800, for which *426 France and Spain were liable as joint tortfeasors, still, if they were not relinquished to France by the retrenchment of article 2 of that treaty, no liability attached to the United States.
2. In determining the questions as to whether the United States relinquished to France claims to indernnhy which existed against France and Spain as joint tortfeasors prior to the convention of 1800, the court will consider in connection therewith the treaty of 1819 with Spain, the other tortfeasor, and will give to that treaty, the last expression of the sovereign’s act, the meaning its language imports.
3. By accepting satisfaction from Spain under the treaty of 1819 the United States thereby elected to look to Spain alone for the payment of “all claims on account of prizes made by French privateers and condemned by French consuls within the territory and jurisdiction of Spain,” and by that act released France. So that, whatever liability arose against the United States to make compensation for such claims arose under the treaty of 1819, for the satisfaction of which provision was made in that treaty.
It is ordered that the findings and conclusions herein, together with this opinion, be certified to Congress for “final action.”