Nott, Ch. J.,
delivered the opinion of the court:
The first question in all French spoliation cases is whether the American owner had a valid diplomatic claim against France at the time of the ratification of the treaty of 1800; the second is whether this claim was one of those which were released for a valuable consideration by the United States to France. Not all spoliation claims were so relinquished to France. Some were provided for, or intended to be provided for, by that or other treaties; some were exceptional claims, abandoned, intentionally or unintentionally, in the diplomatic vicissitudes of the time. (The Leghorn Seizures, 27 C. Cls. R., 224.)
The second article of the treaty of 1800 declared the inability of the ministers plenipotentiary to agree, and provided that these spoliation claims should remain intact for subsequent negotiation. The supplemental clause, appended to the treaty by the First Consul at the time of the final exchange of ratifications, July 31,1801 (subsequently approved and accepted by the United States, December 19, 1801), in substance provided that the second article should be ■ retrenched, and that by this “ retrenchment ” these spoliation claims should be released or relinquished to France in consideration of a reciprocal -relinquishment of a public claim which France held against the United States. Out of this relinquishment of these private claims for a public consideration the responsibility of the American Government arose. (Gray's Case, 21 C. Cls. R., 340; Hooper's Case, 22 id., 408.)
In an ordinary document, whether it be a contract, statute, or treaty, the provisions are framed, or supposed to be, with due regard to each other, and the parts boar some relation to the whole. But in the treaty of 1800 the vital provision, *293 whereby France and the United States relinquished mutual demands and discharged each other’s indebtedness, was not a part of tho treaty as originally framed, but an addendum thereto, entered into ten months after the signature of the treaty. Its purpose ivas entirely foreign to the thought or intent of the contracting parties when they framed and agreed upon the preceding articles. Undoubtedly it must be interpreted and construed with regard to the treaty of which it is an appended part; but none of the previous articles can be explained or modified by it; they must be interpreted with reference to each other and the second article as it originally stood before the addendum came and swept it out of the treaty and its subject-matter out of existence. In a word, as the relinquishment of the American claims to France was not contemplated at the time when the treaty was framed, the supplemental article can throw no light upon the obscurity of its provisions; and in the ascertainment of the intent of the high contracting parties when they signed the treaty we must proceed as if the second article had remained a part of the instrument and those claims had continued to be held in abeyance as a subject for subsequent negotiation.
Those claims, now known as spoliation claims, loosely and vaguely described in the second article as “ indemnities,” “due or claimed,”" were tho first subject-matter disposed of by the treaty. With regard to them it was expressly declared that the contracting parties could not agree upon an adjustment at that time, but it was nevertheless agreed that the. claims should be kept alive and be the subject of further negotiation “ at a convenient time.” In other words, France would not then consent to pay these claims, but did consent that they, should not lapse or be extinguished by an implied operation of the treaty. Nevertheless, though unwilling to discharge this indebtedness then, France was willing to dispose of all other demands then pressed upon her, and these claims, expressly reserved for further consideration • by the second article, and other claims disposed of by subsequent articles, ivere supposed to include all subjects of difference then existing between the two countries.
Accordingly the French Government agreed that the causes *294 of 'difference — the depredations of' French cruisers and privateers. upon American commerce — of which the spoliation claims were the effects, should come to an end. The French Government also agreed that although the liability of France to pay “ indemnities ” to American citizens was not conceded by the treaty, nevertheless redress should be given so far as redress would not involve the payment of money. That is to say, it was agreed that restitution should be- made of all property which had been captured, or ivhich might be made of all property which had been captured, or which might be captured “ before the exchange of ratifications,”- if it still remained within the control of the French authorities.
This obligation of the French Government to restore property within its control ivas expressed by a phrase which has occasioned much confusion and misconstruction — “ not yet definitively condemned.” “Property,” says the fourth article, “ captured, but not yet definitively condemned or which may be captured before the exchange of ratifications, shall be restored.” The idea was that if the French Government could restore the property, it should; but if proceedings had come to an end in the French tribunals, judicial or administrative, and the property had thereby passed beyond the constitutional control of the French Government, the liability of paying for it should be a matter of future negotiation. A later provision of the treaty makes this clearer.
The treaty recognized the fact that it was possible that, after its signature, property might be condemned “ contrary to the intent ” thereof, and “ before the knowledge of this stipulation shall be obtained.” For such illegal acts of its tribunals France acknowledged an additional liability. As. to such property the treaty provided that it should be restored if it could be; but if it could not be, it should bo 11 paid for.” (Art. 4.) The liability thus conceded for which France should respond in money was not for the fault of its cruisers in violating the treaty of 1TT8 or the obligations of international law, but for the fault of its tribunals in disregarding the obligations of the treaty of 1800.-
The treaty of 1800, therefore, left these-matters of difference in this plight: (1) All claims for captures and condemnations which the American Government, on the 30th of *295 September, 1800, asserted to be illegal, were reserved for future negotiations; (2) all property so acquired which was still within the control of the French Government — that is to say, not yet “definitively condemned ” — should be “restored/” (3) all property that might be subsequently condemned, contrary to the intent of the treaty, if not restored, should be “paid for;’’’’ (4) and, inferentially, all claims not included in the foregoing classes should be abandoned.
The facts upon, which the present cases rest, briefly stated, are these:
On the 15th of December, 1799, the ship Tom sailed from Boston, bound for London. On the 13th January, 1800, she was captured on the high seas by the French privateer Eole. The ship carried her proper passport and papers; the ground of seizure ivas that a portion of the cargo belonged to English owners. This court now finds, as the ■Council of Prizes found, that .the suspicion was unjustifiable and the capture illegal. While in possession of the prize crew the vessel was run ashore on the French coast to prevent a recapture by an English cruiser, and thereby became a partial loss. Portions of the vessel and cargo were saved. On the 23d November, 1800, the Council of Prizes rendered a decree reciting the facts and directing restitution of all that had been saved from the wreck, as well as the ship’s papers, but without indemnity. Subsequently the decree was carried into effect; portions of the ship and cargo had been saved, and a dividend of $44,093, derived from the sale, was ultimatety divided among the American claimants.
The decree of the Council of Prizes is not before the court, but the results, reported by Brodhead and Tuck, indicate that the French tribunal, upon the evidence before it, reached two conclusions — first, that the cargo was all American property and therefore not subject to condemnation; second, that the seizure, in the circumstances of the case, was justifiable and should not subject the captors to damages.
We are inclined to think that both of these conclusions were sound. As was held in the case of the Caroline Wilmans (27 C. Cls. R.., 215), an invoice consigning property to a consignee in a belligerent port, “ who is to pay freight and *296 charges,” raised not a legal presumption that the cargo ivas-the property of the consignee, but a reasonable suspicion that it was belligerent property. A naval officer on the high seas must act summarily; he can not examine witnesses; he is .not bound to take the unverified explanations of the master as abs'olute verity. He must judge from the documents which the consignor has furnished, and. where they leave the ownership a subject of reasonable suspicion the fault or misfortune is the owners’. At that day, when there was no telegraphic communication, and mail communication between England and America ordinarily involved months, merchants were in the habit of shipping their goods for a market. Ordinarily in such cases the shipper paid freight and charges, though a consignee ivas designated. Occasionally, and very rarely, an invoice or bill of lading notifies the master of the vessel that freight and charges are to be paid by the consignee. Of course, such an arrangement could exist between consignor and consignee, though the cargo remained the property of the former, but where goods were shipped in an exceptional manner to a consignee in a belligerent port, who was to pay all the costs and charges of transportation, and with no directions or reservations on the part of the' consignor indicative of his ownership, a naval officer might reasonably suspect that the cargo ivas belligerent property and take the vessel in, if he could not remove the cargo to have the question determined by the proper tribunal. (The Ship Joanna, 24 C. Cls. R., 198.)
But in the present case another and new question is presented by the facts. It appeal’s, by the protest of the master, and likewise by the decree of the Council of Prizes, that the vessel was run ashore, or, as the decree terms it, “ stranded,”’ to prevent her recapture by an English cruiser. If she had been recaptured, she would have been restored to her owners. Had the captors the right to prevent this by the deliberate and voluntary destruction of the vessel ?
From one point of view they had. A belligerent has a legal right to prevent property from falling into the hands of his enemy. Whether property so destroyed shall be paid for is a question of moral obligation. Vatal and other great publicists hold that it should be. But here the property *297 would not fall into the hands of the enemy in the ordinary sense of the term, for on recapture it would revert to the American owners. Furthermore, a belligerent seizing a neutral vessel on the high seas upon mere suspicion is responsible for the act, and for the consequences, and for the vessel, and is excusable for a loss only where it is caused by an unavoidable casualty. The voluntary destruction of the vessel by the captors for their own ends and purposes — that is, to save themselves from becoming prisoners of war — was in a measure justifiable — that is, it was not an offense or a casus belli, but it was an act for their own exclusive benefit, destructive of the neutral’s right to judicial restitution. The acb of such destruction, though not wanton, was not inevitable, and the cost of it should be borne by the party which caused it and not by the innocent owners of the property.
This point- apparently was not considered by the Council of Prizes. Be that as it may, the captors were not made to respond for their destruction of the vessel. The decree therefore did not discharge the claim for indemnity, and France remained liable for the loss, less the proceeds of the property that was restored, and to that extent the claimants are entitled to imdemnity from the United States.
The order of the court is that the defendant’s motion for a new trial be overruled and that the findings and conclusions now filed in these cases be reported to Congress, together with a copy of this opinion.