Howry, J.,
delivered the opinion of the court.
The petition alleges liability for claims under the act of January 20, 1885, 23 Stat., 283. Though the demands are of remote international origin, allowance follows from the court’s action in the nature of an award if the claims are of the class relinquished by treaty to France and assumed to be paid by the United States.
The findings show seizure of the Poll Gary on the high seas by the French privateer and prize proceedings at the port of Grandville in France, whence the vessel was taken after her capture. The trial resulted in a decree for the release of the ship, from which decree an appeal was taken by the captors to the civil tribunal of the Department of the Channel, which reversed the decree of the court of first instance and condemned the vessel and cargo as lawful prize. Thereupon the master for the owners of the vessel appealed to the council of prizes (which was the high court of admiralty at that time for France), and upon this appeal a decree was entered for the release of the vessel and cargo without damages. But pending the prize proceedings in the tribunal of commerce at Grandville, the master for his owners had brought another suit against the captors for damages and obtained judgment which obliged the privateersmen to maintain at their expense the people on the American vessel, the master stating that he had gained his case.
Subsequent to the decree of the civil tribunal of the Department of the Channel the master complained to the American consul that he was without security from the privateer, and this complaint was laid before the French minister of exterior relations, who transmitted the complaint to his Government. The transaction seems to have closed at this point, as there is no record of any further controversy over the matter of settlement or the giving of security for reimbursement by the privateer. But the Poll Gary remained in the harbor at the port where two prize courts had decreed its release, and the vessel was there when the treaty of September 30, 1800, was signed. It remained there until June 5,1801. But it seems that though the vessel was lying at her moorings at the port and harbor of Granville, on *225 January 6,1801, the Poll Gary was sold by the owners of the privateer, who described themselves as coowners of said ship under a conveyance dated November 5, 1799, to one TIarry Grant. While the vessel was still lying in the harbor at her moorings, on April 23, 1801, Grant conveyed the vessel to one John Mitchell, acting on behalf of William Patterson, of Baltimore. On June 5, 1801, the said vessel (still being at the port of Grandville) was laden with a cargo consigned to merchants in London, England, and shortly thereafter departed the port, and upon this voyage she was taken by British war vessels and carried into Plymouth, England, where she was libeled for salvage.
If the court could reach the conclusion that this were a claim for a certain and positive loss, the demand would appear not to be a second-article claim under the treaty of September 30, 1800, between France and the United States, and consequently the owner’s only remedy was under the treaty of 1803. The decree existing on September 30, 1800, directing the release of the vessel and the payment of all damages carries the conclusion that the demand was never a second-article claim. For claims of this character France acknowledged a liability and promised redress, and a remedy was provided by the treaty of 1808.
The attempt to differentiate the case from The Tom (29 C. Cls. R., 71) will not help the petitioners in the matter of jurisdiction under the decision in the case of The Apollo (35 C. Cls. R., 419).
But in order to show the complete want of merit in the demand the court, while under no necessity to go further, will now take up that phase of the case depending upon the proofs.
The liability of France — which, whatever it was, became the liability of the United States by the terms of the treaty — is not proven. There are many circumstances arising out of the proof that the captured vessel with its cargo was either restored or a money equivalent paid after the court decreed restoration.
The public records of the two Governments show many payments for captured and lost vessels by the convention of 1803 between France and the United States. (State Depart *226 ment Report of Payments of Awards, 8 to 21, inclusive'.) No claim was presented to that convention for the loss of the property involved in this case.
Neither master nor the owners made claim of liability at the time of the occurrences after the decree of release; demanded no restitution of the captured property, which they had a right to do under the treaty if they were not already in possession; and the history attending the whole affair reasonably satisfies us that France did not violate the treaty of 1800.
There is no evidence of any protest subsequent to the final decree releasing the vessel before the American consul, and no evidence of any protest when the master returned to the United States; no charge of unlawful conduct on the part of the captors, and no complaint of any kind of record anywhere subsequent to the final decree.
When the tribunal of commerce at Grandville condemned the privateer to pay for the delay of the vessel and to replace her cargo on board and to pay. a.11 damages not only for the depredations as well as for the losses and diminution of the cargo, the capturing privateer did not appeal from this decision so that they could, continue to operate under priva-teering license. From this circumstance alone there arises the violent presumption that the captors were not only obliged by the terms of the final decree to make restitution, but that they actually did so.
The master of the Poll Gary collected damages, as shown by his admission. The final decree of release did not include anything for damages. The reason is obvious — the master had already collected whatsoever he was entitled to on this account.
Not only did the decree releasing the vessel operate to give whatsoever t]ie master was entitled to have for his owners, but carries the conclusion that as the master had sued to compel the privateer to maintain the crew and had succeeded in this litigation, the decree was operative for evfirything else and was executed.
The obligation of proving every necessary fact rests upon the petitioners, and that is peculiarly so in this case because *227 of the presumptions arising out of the established facts. It can not be presumed that when the treaty between France and the United States was signed and the Government of the foreign country had actual control of the vessel for months after the execution of that treaty, that the vessel was permitted to depart without the consent of the master upon such restitution as satisfied him and his owners. All the proof in the case shows that the vessel did not depart the port until the year after the treaty had taken effect. We think it is now too late for a court of this Government to assume that France made her treaty and immediately refused to carry out its terms when the means were at hand to enable her to do so.
From the proof the presumption can not arise that France violated its duty in that behalf; and if such a charge could be considered it would.be in the nature of a negative allegation of international neglect and the onus would still be with the claimants.
In cases of neglect of official duty the presumption attaches that public officers have properly performed their functions. Prosecutors in such cases are required to prove the negative. Thus in an information against Lord Halifax for refusing to deliver up the rolls of the auditor of the exchequer, in violation of his duty, the public prosecutor was required to prove the negative. (1 Greenl. Ev., sec. 80.) The rules of presumptive evidence are applied with a larger freedom in courts of admiralty than in equity or at common law. (3 Greenl., sec. 406.)
Presumptions arise from motives of public policy and for the sake of greater certainty. Conclusive presumptions are always made in favor of judicial proceedings and are applied under that rule of law which attaches itself to the circumstances when proved. Then it becomes a rule of protection.
Such presumptions have been frequently applied in the disposition of cases under the present act of our jurisdiction either to establish liability or the want of it because of the impossibility of obtaining direct evidence on demands so ancient. Contemporaneous with the present case is that of the Happy Couple, No. 294, where the decree of the French *228 prize court recited a statement made at sea by the captain of an American vessel, in which he testified that he delivered four documents and his clearances, which included a sea letter and a notarial instrument serving as a register of his ship. The issue was the existence of the necessary register showing nationality. From the recitals of the French decree the court applied the presumption that the requisite of the American character of the vessel had been made out.
It was long ago settled in the English courts that judgment in an action, in which C recovered damages against A, is conclusive proof as against B, that C did recover damages against A in that action. (Green v. New River Co., 4 T. R., 590.) Presumptions arise also in favor of the due execution of solemn instruments because the law in such cases will supply the defect of proof by presuming that the requisites of the statute were duly observed. The principle has been applied where the subscribing witnesses to a will are dead, or if living and being present, they are forgetful of any fact material to due execution. And likewise, negligence of a defendant will not be inferred from the mere fact that the injury occurred or from presumption of care on part of the plaintiff. There is equal presumption of care that defendant performed his duty, and the latter must be overcome by direct evidence. (Looney v. Metropolitan R. R. Co., 200 U. S., 480.)
Practically the general proposition stated here has been applied decisively in a French spoliation case. Where an appeal appears to have been taken, but the result does not appear, the burden of proof remains with the claimants to establish the extent of their loss. (The Dolphin, 27 C. Cls. R., 276.)
Definitive condemnation not being established by the facts, but a decree of release (which was apparently executed) appearing, the court can not for these reasons report a loss.
The case comes directly within the principle cited with approval by the Supreme Court in Tilt v. Kelsey (207 U. S., 52), where it was said, “A judgment in rem is an act of the sovereign power, and as such its effects can not be disputed, at least within the jurisdiction. If a competent court declares *229 a vessel forfeited * * * a paramount title is passed * * * because tlie Sovereign has said that it shall be so.”
The findings and conclusions of law will be certified to Congress, together with a copy of this opinion.