Peelle, Ch. J.,
delivered the opinion of the court.
On July 15, 1797, the brig Freemason, George Bunker, master, while sailing on a peaceful commercial voyage from Baltimore to Bremen, was captured by the French privateer Dragon, Capt. Jean Eudes, and taken to the port of Paim-pol, France, where, on August 14, 1797, the vessel and cargo were condemned for the benefit of the captors by the tribunal of commerce sitting at Piampol on the ground that the sea *559 letter or passport on board the vessel was not in conformity with the treaty between France and the United States of February 6, 1778, and that the role d’equipage was not in legal form. On appeal the decree was affirmed on September 29, 1797, by the civil tribunal of the Department of the Coasts of the North sitting at St. Brieu, but whether the property so condemned was sold and became a total loss, even if that were material, is not shown by competent evidence. No appeal was taken to the Court of Cassation then open to the owners.
The illegality of the condemnation is conceded by the defendants, but they insist that the vessel was not definitively condemned at the date of the treaty of September 80, 1800, between France and the United States; that the civil tribunal of the Department of the Coasts of the North sitting at St. Brieu was not a court of last resort, though recited in its decree that its decision was “ by judgment in last resort on the appeal from that of the tribunal of commerce sitting at Port Paimpol.” This contention as to an "appeal is based on a letter dated February 27, 1807, from one De la Grange to Agent F. Skipwith, esq., introduced in evidence, from which it appears that an examination had been made by him of the proceedings in the Council of Prizes in the case of the Freemason, and while it is stated that’ an appeal was entered to the tribunal civil des cotes du Nord, there was no judgment of the latter tribunal and that the vessel had not been definitively condemned; but the statement that there was no judgment is an error, as the decree of condemnation of the tribunal civil des cotes du Nord is. in the record, and recites that it was in last resort. So the question is, Was said decision final, or should the owners have taken an appeal to the Court of Cassation ?
Was the decree of affirmance final? That is to say, was it a definitive condemnation within the meaning of article 4 of the treaty, which provides:
“ Property captured and not yet definitively condemned, or which may be captured before the exchange of ratifications (contraband goods destined to an enemy’s port excepted), shall be mutually restored on the following proofs of ownerships, viz:
*560 “ This article shall take effect from the date of the signature of the present convention. And if, from the date of said signature, any property shall be condemned contrary to the intent of the said convention, before the knowledge of this stipulation shall be obtained, the property so condemned shall without delay be restored or paid for.” (Public Treaties of the United States, 715. 8 Stat. L., 178.)
In the case of the ship Tom (29 C. Cls. R., 69-88), following the ruling in the case of the schooner Peggy (1 Cranch, R., 103, 107), it was held that “ if a substantial right of appeal existed on the 30th of September, 1800, the prior decree of a prize court did not on that day constitute ‘ definitive ’ condemnation of the property.” But, the court adds that such substantial right “ must have been real, i. e., practically within the reach of the American master whose vessel had been lawlessly seized and illegally condemned.” Further, that while “ substantial redress was within the reach of those claimants whose vessels had been condemned by prize courts sitting in France, * * * none existed for those whose vessels were condemned in the West Indies or in some of the Spanish ports.” But as in that case the condemnation was not in the West Indies, the language referred to in that respect was withdrawn from the opinion on the motion for a new trial (39 C. Cls. R., 290).
In the case of the ship Apollo (35 C. Cls. R., 411, 420) the court on the question of appeal applied the ruling in the Peggy {supra). In the case of the brig North Carolina (supra) the vessel was captured and taken into the Swedish’ island of St. Bartholomew, where the vessel and cargo were sold by the captors, and two days later the French Tribunal of Commerce and Prizes sitting at Basseterre, Guadeloupe, unlawfully condemned said vessel and cargo, confirming the capture and ordering the sale of the vessel, whereby the same became a total loss to the owners. But whether the French Tribunal of Commerce and Prizes (owing to the absence of the res) was or was not without jurisdiction, the court held that “ the vessel and cargo were not definitively condemned ; ” and, therefore, the owners were remitted to the remedy of having the vessel and cargo restored. But the court held that as the res had ceased to exist and could not *561 be restored the demand for indemnity was not extinguished. This latter holding, however, was not in harmony with the provision of the treaty cited providing for payment in case of failure to restore and in this respect is not in harmony with the ruling in the Peggy (supra).
It is no answer to say that the decree was in conformity with the French law, and therefore an appeal to the Court of Cassation would have been useless, or that the decree of the civil tribunal was final when a substantial right of appeal existed, as it did in the present case. True, as said in the Peggy (p. 108), the decree was “ final in relation to the power of the court, but not in relation to the property itself, unless it be acquiesced under.” By the terms of the treaty it was the property in controversy that was directed to be restored. It was also there said: “An interlocutory order for a sale is not a condemnation. A 'stipulation, then, for the restoration of vessels not yet condemned would, on this construction, comprehend as many cases as a stipulation for the restoration of such as are not definitively condemned. Every condemnation is final as to the court which pronounces it, but no other difference is conceived between a condemnation and a final condemnation than that the one terminates definitely the controversy between the parties and the other leaves that controversy still depending.” (See Sharon v. Hill, 26 Fed. R., 337, 389, citing Hills v. Sherwood, 33 Cal., 478.) Hence, if there had been an appeal in this case, the decree of condemnation might have been reversed and the property ordered restored. The condemnation was in France. An appeal was open and accessible. Therefore the owners can not, in the face of the treaty, justify their silence or claim by accepting the decree of an inferior court as final, though the property may theretofore have been sold. This for the'reason that the liability was that of France and not the captors.
In response to the contention that the court could take no notice of the stipulation in the treaty “ for the restoration of property not yet definitively condemned,” the court, referring to the provisions of the Constitution declaring a treaty to be the supreme law of the land, in effect held that where *562 a treaty affects the rights of parties litigating in court the treaty was as much binding upon those rights and was as much to be regarded by the court as an act of Congress. This ruling was followed in the case of De Lima v. Bidwell (182 U. S., 1, 195).
In the face of this decision in the Peggy, can the court hold that though a substantial right of appeal existed and was accessible to the owners, they are excused therefrom on the ground that the property may have been sold and disposed of under the decree of an inferior court? We think not. As was said by the court in the case of the brig North Carolina (supra), “Apart from the treaty of 1800, it is the duty of the owners of a captured vessel to exhaust their legal remedy against the captors before they can assert a liability on the part of the belligerent Government whose privateers have seized their goods.” Such also was the decision of the court in the case of the ship Tom (supra), where, at page 88, it was said, “ If, then, France would have been entitled to have the remedy against the captors exhausted before she could be held responsible for their captures, much more may the United States insist upon the same defense, they having assumed no debt or obligation which the treaty of 1800 contemplated would be borne by the French Government or French citizens.”
To the rule thus announced, however, the court held that a substantial right of appeal must have been practically within the reach of an American master; that while such right did exist in prize courts sitting in France there was no such right practical from prize courts sitting in the West Indies. That is to say, the legal demand to indemnity against France continued notwithstanding the owners’ failure to exhaust their remedy against the captors. This, however, was because an appeal was impractical, and not'because the property had been sold, i. e., the sale of the property did not affect the right of or duty to appeal.
Congress, however, in the jurisdictional act has restricted the court in determining the validity of such claims “ to the rules of law, municipal and international, and the treaties of the United States,” thereby limiting the liability of *563 the United States to claims that would have been valid against France under the same rules.
In case of the ship Appollo (supra) the condemnation was by a French consul sitting as a prize court in Spain, whose decree was affirmed by the civil tribunal at Nantes, but in the meantime the property had been delivered to the captor and sold. An appeal was taken therefrom to the Council of Prizes, where the case was pending at the time of the treaty of 1800. Thereafter and before the exchange of ratifications the decree was reversed and restitution of the vessel and cargo was ordered. The vessel was, in addition, partially burned in tarring and became valueless, so that restitution of the property became impossible and, in the meantime also, the captor had become insolvent. And in respect thereto the court said:
“ By article 5 of the treaty of 1808 (Public Treaties of the United States, p. 236), referring to the debts due from France to citizens of the United States contracted before the convention of September 30, 1800, and such as were due for ‘ prizes made at sea in which the appeal had been properly lodged,’ it was provided: ‘ The preceding articles shall apply only, first, to captures of which the Council of Prizes shall have ordered restitution, it being well understood that the claimant can not have recourse to the United States otherwise than he might have had to the Government of the French Republic, and only in case of insufficiency of the captors.’ * * *
“ Thus, where the Council of Prizes had ordered property restored, as in the case at bar, and restitution of the property or a money equivalent failed by reason of the ‘ insufficiency of the captor,’ France recognized her liability to make good such loss by a money equivalent; and such is the general rule. (Broom’s Legal Maxims, pp. 247, 248.)”
In the case of the Poll Cary (ante, p. 219) the «vessel was captured and taken to Grandville, France, where the Tribunal of Commerce ordered the release of the vessel and cargo. On appeal therefrom by the captors to the Civil Tribunal of Commerce of the Department of the Channel, they reversed the decree and condemned the vessel and cargo as lawful prize, but on appeal therefrom by the owners of the vessel to the Council of Prizes the vessel and cargo were released without damages. The owner complained to *564 the American consul that he was without security from the privateer, which complaint was laid before the French minister of exterior relations, who transmitted the complaint to his Government, but what became of it was not disclosed in the case.
But as no claim was made or restitution demanded the court reached the conclusion, from the history attending the whole transaction, that the treaty of 1800 had not been violated by France, and this was strengthened from the fact that there was no pimtest to the American consul subsequent to the final decree, nor by the master on his return to the United States, who appears to have collected damages, which was, doubtless, the reason of the release of the vessel and cargo without damages. The court held that as the Council' of Prizes had, on November 29, 1800, released the vessel‘and cargo, the claim came within the fourth article of the treaty and the property should have been restored to the owners. Hence there was no claim to indemnity under article 2 of the treaty.
In the case of the ship Governor Bowdoin (36 C. Cls. R.. 338), the vessel was seized and carried into the Isle of France, where restitution was ordered by the Tribunal of Commerce, but on appeal the civil tribunal reverses the decree and condemns the vessel and cargo. The master gives notice of an appeal to the Court of Cassation and requests that the captors be required to give security, but the court refuses and orders the sale of the vessel and cargo.
While it was held that a declaration of an intent to appeal did not raise a presumption that an appeal was taken, th'e court said that under the circumstances there was nothing to appeal for. That the owners were not required to do a vain thing for the protection of the French Government.
However, as the condemnation was in the Isle of France, 9,000 miles distant from the Court of Cassation in France, the court held that the owners were not obliged to appeal, and, not being obliged to appeal, their claim to indemnity, whether the property had been sold or not, was established. Here the condemnation was in France, where the courts of last resort were open to the owners, and if they could not *565 have secured restitution of tbe vessel and cargo, they could have pursued tbe captors for their value and, failing, would have established a valid diplomatic claim against France.
Furthermore, if we were to accept the letter of Skipwith, heretofore referred to, as competent evidence, then an appeal was taken to the Council of Brizes and was pending there at the date of the treaty of 1800. But we prefer to dispose of this case without reference to the competency or incompetency of said letter, believing that under the treaty the rules of international law and the decisions of the highest courts and of this court that it was the duty of the owners of the vessel so captured in France to exhaust their remedy on appeal as a condition precedent to the establishment of a diplomatic claim to indemnity. As was said by the court in the case of the ship Tom (supra) at page 88, “Whether a claimant exercised his right or not, whether the appellate jurisdiction was friendly or unfriendly, known or unknown, whether the course pursued by the French Government was fair and judicial or such as to make the remedy hardly worth pursuing, are conditions which do not modify the effect of the treaty or affect the present liability of the United States.” In other words, the neglect or failure of the owners to pursue and exhaust their remedy can not be construed to operate as changing the liability of France as it existed at the time or the consequent liability of the United States under the act of our jurisdiction.
The liability was that of France, as she had authorized the capture, and presumably had taken security from the privateer at the time of issuing her a commission by way of indemnity against her unlawful conduct or violation of instructions (Hall’s Int. Law, sec. 180). Therefore the right to the captured property vested primarily in France, and whether such captures were made by a public or private armed vessel, no individual had or could acquire any interest therein without her sanction. (Kent’s Com., vol. 1, pt. 1, p. 100; Pistoye and Duverdy, 157; The Elsebe, 5 C. Rob., 181.)
Hence had the owners exhausted their remedy by appeal, whether the vessel was sold and could not for that reason be restored, or whether it had not been definitively condemned, *566 France would have been liable either for the restoration of the property or its value, and to her the owners looked, as the United States did later, not only under the rules of international law, but under the treaties which were entered into between the two Governments.
As the condemnation in this case was in France, where the right of appeal was accessible and open to the owners, they should have exhausted their remedy without reference to the probability or improbability of the court’s action, and, not having done so, they are not entitled to indemnity under the retrenchment of the second article of the treaty of 1800.
The findings and this opinion will accordingly be certified to Congress.