Nott, Ch. J.,
delivered the opinion of the court:
The question presented by this and other cases is whether the owner of a vessel seized by a French cruiser or privateer upon the high seas and carried within the jurisdiction of a friendly neutral nation, and while there illegally condemned, was entitled to • indemnity against France. A variation of the question is also in some of these cases presented, viz, whether the seizure of an American vessel within the waters of a friendly neutral power does not render the latter exclusivety responsible.
In the absence of an international code defining the rights and duties and obligations of nations one toward another, it is exceedingly difficult for a court to deal with such cases; and it is by no means clear that a court would be justified in dealing with them as with cases of ordinary wrongdoing between ordinary persons under municipal law. The duty which a nation owes to its own citizens is largely a law unto itself. *266 International law dictates and restoring the proceedings of a belligerent power; but international law has never yet said, “You have no lawful right to wage war.” The demand for redress by one nation against another has frequently been a prelude to war, and as the greater includes the less, it must be said that the right to demand redress is included in the right to wage war.
If it clearly appeared in these cases that the American Government had specifically demanded redress from France, or if it clearly appeared that it had demanded redress from both France and Sweden, or Holland, or some other nation, for the illegal seizure and condemnation of a vessel, or class of vessels, this court would not be at liberty to say that it had not the right to do so. The fact, however, is that no case has been brought to the attention of the court concerning which the United States asserted a liability on the part of both Franco and a neutral power, or in which they asserted specifically a liability on the part of France notwithstanding the primary liability of the other nation.
The cases which come closest to this in the adjudications of the court are those which are known as “ The Leghorn Seizures” (27 C. Cls. R., 224). In 1796 war existed between France and Austria. Napoleon entered the neutral territory of Tuscany and seized the property of American citizens in Leghorn. It did not appear that the claims were ever pressed by the United States against either France or Tuscany. The question before this court was whether a suit could be maintained under the French spoliation act by the owners of the property. The question now involved was not the only question in the case, and was not the question upon which the decision rested; but incidentally the court adverted to the obligation of Tuscany to protect the property of American citizens, and her liability to answer for the same. The caso has been frequently reviewed before the court, but nothing-that has been said and no authority that has been produced has led us to depart from what was then said in regard to the general question.
“ When an American merchant places his goods on an American ship they do not lose their nationality because she leaves ]Dort. An American vessel on the high seas is in contemplation of law American territory. The obligation of the *267 Government to protect the property of the citizen, varied but unimpaired, remains. Every government owes protection from foreign aggression to the person and property of every citizen. So long as he and his goods remain under the American flag it is immaterial whether it waves on land or sea.”
“ It is true that the political arm of the American Government might have taken hold of this matter, but it might have done so though no American citizen had lost a dollar’s worth of property. Great national considerations can not depend upon the rights or wrongs of individuals. All the neutral nations of the world might well have made common cause with the Duke of Tuscany in demanding reparation or declaring war. It is also true that when a weak power like Tuscany is utterly unable to afford protection or demand redress against a great power like France, a strong obligation will rest on the American Government to overlook the intermediate nation and demand redress from the wrongdoer; but ordinarily the obligation to afford protection or demand redress rests on the other Government — the Government which was immediately charged with the duty of protection.”
In a word, the Government which owes protection to American property actually within the jurisdiction of its sovereignty is the Government which is primarily liable for wrongs and outrages which occur therein.
It is to be noted that ordinarily there is no such thing as a seizure which f&r se can be deemed illegal. The right of seizure is incidental to the right of search; and the right of search is a right which every belligerent may exercise under international law. In the orderly course of prize proceedings, if a seizure is unjustiflable the captors will be liable in damages to the owners, and the vessel be released. It is not until the facts are established that the seizure can be characterized as illegal. If a vessel should be lost before condemnation, as in the case of the brig Caroline Wilmans (27 C. Cls. R., 215), the court will investigate the facts and circumstances of the seizure, and determine the question of its legality or illegality. And if a vessel should be seized and carried in and sold by the captors without condemnation, the court would hold the sale, and incidentally the seizure, to have been illegal. But ordinarily nothing can be asserted against the seizure until the prize court of the belligerent power has acted. It is the illegal or unjustifiable condemnation of a vessel which constitutes the *268 grmamen of an offense, where seizure is followed bjr condemnation. We can not now make two claims out of one transaction, and say that France was liable for the illegal seizure and Sweden or Holland for the illegal condemnation. Thus we are brought back to the question whether in the cases of condemnation, while a vessel is in neutral territory, the^ are cases where Holland, Sweden, or some other country owed protection to this American property, and whether that liability is now to be regarded as exclusive.
In the case of the Netherlands the treaty of the 8th of October, 1782 (Public Treaties, p. 533, Art. V), provided that—
“Their High Mightinesses the States General of the United Netherlands and the United States of America shall endeavor, by all the means in their power, to defend and protect all vessels and other effects belonging to their subjects and inhabitants, respectively, or to any of them, in their ports, roads, havens, internal seas, passes, rivers, and as far as their jurisdiction extends at sea, and to recover and cause to be restored to the true proprietors, their agents, or attorneys, all such vessels and effects, which shall be taken under their jurisdiction.”
In the case of Sweden, the treaty of the 3d of April, 1783 (Public Treaties, p. 729, Art. I), provided that—
“ His Swedish Majesty shall use all the moans in his power to protect and defend the vessels and effects belonging to citizens or inhabitants of the United States of North America, and every of them which shall be in the ports, havens, roads, or on the seas near the countries, islands, cities, and towns of his said Majesty, and shall use his utmost endeavors to recover and restore to the right owners all such vessels and effects which shall be taken from them within his jurisdiction.”
Apart, then, from the obligations of international law, these treaties laid upon these two Governments the most positive obligations to protect the vessels of the United States coming within their jurisdictions.
In one of these cases an American vessel, the Russell, was seized while lying at anchor under the guns of a Dutch fort at Angre, island of Java, in the Straits of Sunda. A French prize court sitting at the Isle of France and also the appellate court, on appeal of the captors, decreed her restitution to the owners. As between France and the United States it can not *269 be said that there was an illegal condemnation, though the seizure was not justifiable, and the. owners suffered heavy losses, which were not made good to them. For this damage there may have been a liability on the part of France, and certainly there was a liability on the part of the Netherlands. The question now presented to the court is whether a claim was asserted against France by the United States directly or constructively which made the claim one of those that were relinquished to France by the treaty of 1800.
In another of these cases an American vessel, the Reliance, was seized within 1 mile of the shore in Swedish waters. If the captors had carried her off to some French port and there condemned her the liability of Sweden would be-merely constructive, the vessel having been within its jurisdiction, yet hardly within its actual power of protection. But the captors carried her into the Swedish port of St. Bartholomew, and the master of the vessel appealed to the governor and Swedish authorities demanding her release; and the Swedish authorities allowed her to be condemned by a French prize court sitting at Guadeloupe, and allowed the decree of condemnation to be carried into effect.
In a third of these cases — the brig Happy Return — the vessel was seized on the high seas and carried into the Dutch port of Great Bay,-island of St. Martins. The vessel was condemned by a prize court sitting in French territory with-' out affording the owners an opportunity to demand release. The governor of the island was aware of the facts, yet took no stop to secure the release of the vessel, and an illegal condemnation was carrod into effect while the vessel lay in a Dutch port entitled to the protection of the Netherlands.
The last case is identical with those cases in which it has boon held that France was liable for the illegal seizure and condemnation of vessels which were carried into Spanish ports and held and sold there under condemnations made by French tribunals sitting in French territory.
There are, however, certain peculiarities in the case of the United States relations with Spain, as evidenced by the Spanish treaty of 1819.
The treaty related to other and more important things than the claims of individuals: (1) It provided for the cession to *270 the United States of the Floridas; (2) in consideration of this cession the United States agreed to advance a fund not exceeding 15,000,000 for the payment and discharge of claims of American citizens against Spain; (3) it provided for the renunciation of all claims for “ the injuries mentioned in the convention of the 11th of August, 1802,” to wit, “claims originating from the seizures of foreign cruisers, (igents, consults, or tribunals, in their respective territories, which might be imputable to their two Governments;” (4) it specifically provided for the payment of such of these renounced claims as were “on account of prizes made bjr French privateers, and condemned by French consuls within the territory and jurisdiction of Spain;” that is to say, the treaty recognized only this last class of claims as claims for which Spain was held accountable; (5) finally the United States certified (article 14) “that they have not received any compensation from France for the injuries they suffered from her privateers, consuls, and tribunals on the coasts and in the ports of Spain for the satisfaction of which provision is made by this treaty. ” In the consideration of such cases the court has regarded the treaty as evidencing the fact against the United States, now the responsible party, that where a vessel was illegally seized upon the high seas and illegally condemned by a French tribunal in French territory they would regard France as the power primarily liable, and would not press a claim against Spain because the vessel was carried into a Spanish port and held there during prize proceedings in French territory.
On recurring to the diplomatic correspondence and State papers in the early part of the eighteenth century, we- find that such was the attitude taken by the American Government.
First in importance, though not in time, is the message of the President, Mr. Jefferson, to the Senate December 21, 1803. This was not the instructions of a Secretary of State to a minister abroad, but the authoritative declaration of the responsible head of the nation making known to the coordinate branch of the treaty-making power the international polio}1, which the American Government had adopted and would pursue.
“As this instrument did not embrace French seizures and condemnations of our vessels in the ports of Spam, for which *271 we deemed the latter poioer responsible, our minister at that court was instructed to press for an additional article comprehending that branch of wrongs. ” (American State Papers, Vol. II, Foreign Relations, p. 596.)
In previous instructions given by the Secretary of State to the American minister at Madrid it is said:
“I need not repeat the observations heretofore made on the Spanish responsibility for the conduct of French citizens within Spanish jurisdiction, but it may be of use to refer you to the inclosed copy of a royal order issued by the Spanish Government in 1799, which will enable you to remind them of their own view of the subject at that time. ” (American State Papers, Vol. II, Foreign Relations, p. 596.)
Pursuant to these instructions the American minister, Mr. Pinckne}', thus addressed the Government of Spain:
“Butin order to remove all doubt on the subject, and to show how well founded is the right the United States have to expect that this class of claims will be admitted at least to arbitration, I am also directed to refer your excellency to the inclosed copy of a royal order, issued by the Spanish Government in 1799, which must remind your excellency of the view of your Government and of their opinions at that time on this subject. In this document it is expressly declared that the French considur jurisdiction was not admitted in Spain, and that French consuls in Spanish ports were, and always have been, in the same condition only with those of eveiy other nation.
“After such a declaration against the authoiity of French consuls the Spanish Government never can say, or have they ever said, they were not left at liberty to prevent an exercise of the usurped authority; and if at liberty, she is indisputably answerable for the consequences of not preventing it. A document which I also take the liberty to add will explain the just sentiments entertained by the Batavian Government during the same period in relation to a case turning on the same principle.” (American State Papers, Vol. II, Foreign Relations, p. 600.)
Going back to the first instructions issued to our minister abroad, it appears that on June 9,1801, the Secretary of State thus wrote:
“The documents and letters belonging to the legation, which you will receive from Colonel Humphreys, will put you in possession of the several subjects remaining unfinished in his •hands. These you will pursue into their proper result. You *272 will find that he has been instructed to urge particularly on the Spanish Government redress for such of our citizens as have suffered from captures made by privateers unlawfully cruising out of Spanish ports, and from wrongful condemnations, Tooth by Spanish tribunals and by decisions of French, consuls within Spanish jurisdiction. In all these cases it will be your duty to carry on the proper measures in train for obtaining justice. Colonel Humphreys, you will find, thinks that the Spanish Government means to turn us over for redress to the French Republic in all cases where the prizes have been under French commissions or been condemned by French consuls. You will be at no loss to combat such an idea by proper arguments drawn from sources in your possession or within your reach, and by suitable appeals to the principles and motives which ought to direct-the conduct of a wise and just Government, more especially toward a nation entertaining the sentiments and observing the conduct which have been experienced by Spain from the United States.” (American State Papers, Vol. II, Foreign Relations, p. 476.)
Again, the Secretary of State, writing to the American minister at Madrid, said:
“It is not denied that there are certain exceptions to the authority over those within a temporary, which do not apply to the authority over those within a permanent allegiance; and so far there may be exceptions to the responsibility of the sovereign also. But none of these exceptions belong to the cases in' question. In the equipment of privateers and the condemnation of prizes, in Spanish ports, the King of Spain had the same authority to restrain, aliens as he had to re-strain his own subjects from illegal acts toward other nations. Having this authority, his duty to other nations required him to exert it; and, failing in his duty, he made himself answerable to those injured by the failure.”
“ The losses sustained by América/ns, from, aliens, and for which Spain is held answerable, ham proceeded, first, from, condemnations within her jurisdiction; secondly, from eguipments within her jurisdiction known to be against the American trade; thirdly, from equipments ostensibly made against the enemies of Spain, but turned against the United States; fourthly, from captures only withi/n the limits of Spanish, jurisdiction^ (American State Papers, Vol. II, Foreign Relations, p. 479.)
The preceding paragraph sets forth evidently all of the classes of claims for which the United States demanded redress from Spain.
*273 Mr. Pinckney laid, the matter before the Spanish minister, and thus reported his interview to the Secretary of State:
" He appointed the Wednesday following, at the palace in Aranjuez, at which clay I attended him, and entered fully into an explanation of the nature of our claims, as well for spoliations made by the subjects of Spain as by the subjects or citizens of other powers who had been permitted to arm and equip their privateers in Spanish ports, and condemn and Hell the vessels they had taken under the authority of French consulates exercising, the powers of courts of admiralty; that this permission to arm and equip and to condemn, and sell had, for reasons T stated to him, rendered the Spanish Government responsible to our citizens for all the losses accruing thereby to innocent and legad traders; that precisely the same thing liad occurred at the commencement of the war between England and France, in some of the American ports; that our Government, as soon as they were informed of it, had interfered and prevented it, and agreed to pay for such as had been previously taken' and brought in and condemned, and that having-done so themselves they had a right to expect it from others, particularly from a Government whose justice and honor they had always held in the highest repect.” (American State Papers, Vol. II, Foreign Relations, p. 481.)
On August 80, 1803, Mr. Pinckney reported that the Spanish minister had set up as a defense for Spain the relinquishment of our claims for French spoliations to France by the treaty of 1800, and that he had replied:
“Thatthe relinquishment he spoke of to France has nothing to do with our claims on Spain; that we never considered ourselves as having any right to demand compensation from France for these violations of the territory and sovereignty of Spain by the cruisers and consuls of France; that they were by no means included in the claims relinquished, but were as distinct and separate as claims could bo.” (American State Papers, Vol. II, Foreign Relations, p. 598.)
It is therefore perfectly clear that contemporaneously — that is to say, before and from the time of the retrenchment of the second article of the treaty of 1800 with France — the American Government made no claim against Spain for illegal condemnations occurring in French territory, and, as it had a right to do, elected to hold France liable in cases where the unlawful acts which resulted in wrongs to American citizens began and ended under the French flag; that is to say, where *274 the capture was on the high seas in French territoiy, it was France and France alone which would be held responsible.
The distinction between the two classes of cases is artificial and arbitrary, and the difference is in degree .and not in kind. The injury which Spain did to friendly neutrals in such cases, and not alone to the. United States, was not merely in allowing a French tribunal to exercise jurisdiction under the Spanish flag, but in allowing France, a belligerent, to use Spanish ports as French ports, and to make Spanish territoiy French territoiy. To all intents and purposes Spain allowed the French flag to take the place of the Spanish flag, both in the harbor and on the land, and in doing so voluntarily, and not under the compulsion of a ids major, she became responsible to the nation injured. In a word, she went out of her way to countenance and aid proceedings which resulted in divesting American owners of their property in vessels which were entitled to her protection and assistance.
Upon this point we fortunately have the words of the great master of admiralty jurisprudence, and they are decisive upon the question involved.
In the case of the The Flad Oyen (1 Rob., 135) it appeared that a neutral skip, seized by a French privateer, was carried into Bergen, Norway, a neutral territory, and condemned there by the French consul. Lord Stowcll was careful to point out that the usage of nations constitutes the law of nations, and the long list of citations in a note to the case (p. 241) shows that the usage of nations was to forbid their own captors carrying prizes into the ports of a stranger, except under absolute necessity. France was the first nation to introduce a contrary practice; but the French editor of the Code des Prises, of 1799 (v. 2, p. 151), reprobated the practice as repugnant to the ancient jrrinciples of the law of nations and as inconsistent with the situation and character of neutral ports.
In January, 1799, Lord Stowell doubted the validity of a condemnation where the prize was in neutral territory and the court sitting in the territory of a belligerent, and withheld the question for fuither consideration. (The Hendrick and Maria, 1 Rob., 146.)
*275 In November, 1799, in the same case (1 Rob., 43,57), he said:
“Upon principle, therefore, it is not to be asserted that a ship brought into a neutral port is, with effect, proceeded against in the belligerent country. The res ipsa, the corpus, is not within the possession of the court; and possession, in such cases, founds the jurisdiction. What is the authority over the parties? Over the captors it is complete, on account of their personal relation to the belligerent country. The neutral government may be called upon, in the usual mode of requisition known to the law and practice of nations, to enforce upon them the orders and decrees of the state to which they belong. But how will it be maintainable over the other parties, who are not subjects either of the neutral or belligerent state, and are, in respect to the point of issue, only subject to a jurisdiction of war? The belligerent state itself has not the means of exercising the rights of war over them directly. Can it call on the neutral state by requisition so to do ? Most clearly not. The neutral state has nothing to do with the rights of force possessed by the one belligerent against the other; it has nothing to do with the enforcement or consummation of such rights: it owes to both parties the simple rights of hospitality, and even these are very limited in the practice of most civilized states. By the regulations of France foreign ships are forbidden to enter with prizes into a port of France, except in cases of distress, and then they are permitted to stay no longer than their necessity exists. Valin observes, on this article, that it can not be doubted that such a rule is exactly conformable to the laws of neutrality; and Hubner admits that a wise hospitality will not be exercised beyond this. At any rate, the neutral state can have no compulsory jurisdiction, to exercise upon either party, upon questions of war depending between them; nor can any such jurisdiction be conveyed to it by the authority of one of them. Its own duties of neutrality prevent the acceptance of aiw belligerent rights; it can not be called upon by requisition to give any facility or convenience to the one party to the prejudice of the other, much less to apply modes of compulsion to the one to serve the hostile purposes of the other.”
“In the administration of a jurisdiction of this kind, the enemy who is vanquished is not only a necessary party, but likewise a necessary witness, according to the proceedings of all countries. Prisoners are necessary witnesses to be examined; according to our instructions thej' are the only witnesses. The French regulations admit the evidence of the captor, but hold, at the same time, that natural justice requires the crew of the captured vessel should be examined touching the rights in question. How are they liable to be compelled to undergo *276 such examination % No force can be applied in the way of strict or continued imprisonment, to compel their answers' to interrogatories. Their refusal would carry no consequence of legal contumacy with it; for legal contumacy can only exist where a legal jurisdiction has demanded a submission. From these considerations it should secan to result, that, in the case of a ship lying in a neutral country, there is not only a want of original jurisdiction'inthe belligerent country, from the want of possession, but that there is, likewise, a substantial defect of that authority which is required for the attainment of justice, and which is essentially necessary to give effect to the ceremony of condemnation. Conformably to this view of the matter, all the more ancient instructions given to cruisers, in almost every country, require that prizes should be brought into the ports of the country to which the cruisers belong. In Denmark, so late as 171Ó, it is required under pain of death. In our own country, the general instructions still in use are, 4 to bring them into some ports of our dominions.’ In Holland, it appears in the instructions cited in the argument from Bynkershoek, that the states did not -consider it sufficient for a prize to be brought into the ports of an ally in the war; for they require, in the terms of their judgment, that it should be brought into the ports of the captor. In France, where the practice of the prize courts has fluctuated more than in any other country, according to temporary views of convenience, no relaxation of the strict rule appears to have been introduced earlier than 1705; and it is worthy of observation, as an inconsistency and injustice of no small magnitude, that at the- very time when their edicts forbade the cruisers of other countries to bring their prizes into the ports of France, the3r should authorize their cruisers to carry their prizes into the ports of other countries.”
But later, in the same opinion, Lord Stowell is driven to to the confession that the then recent practice of the British court of admiralty has been in disregard of the true principle. He says, alluding to certain ports as to which the practice had been allowed:
“Now, unless it can be shown that there is something in the nature of all these ports that essentially distinguishes them from the common character of neutral ports, not merely in certain other respects, but such as furnish a ground of solid distinction for purposes of this nature, I think it will be difficult to avoid the consequence that, whatever the correct principle may be, and however much it might import this country to respect and enforce this principle, this court, at least, is bound against that principle by its own practice.”
*277 And he regretfully concludes:
“I am of opinion, on these grounds, that this court is bound, against the true principle, by the practice which it has not only admitted but applied. The observation of Bynker-shoek, ‘ That in the conduct of war you must hold that to bo lawful in your enemy which you practice yourselves,’ a rule true in all instances, is not-more true in any instance than in one in which the rights and interests of other countries, being neutral, are so directly concerned.”
Nine years later the American courts adopted the relaxed rule, and for much the same reason. Chief Justice Marshall said, in the opinion of the court:
‘'The cases cited from Robinson's reports, and the regulations made by Louis XYI in November, 1799, show that the practice of condemning prizes of war while lying in neutral ports has prevailed in England, and has been adopted in France. The objections to this practice may perhaps be sufficient to induce nations to change it by common consent, but until they change it the practice must be submitted to, and the sentence of condemnation passed under such circumstances will bind the property, unless the legislature of the country in which the captured vessel may be claimed, or the law of nations, shall otherwise direct.” (Hudson and others v. Guestier, 4 Cranch’s Reports, 293, 295.)
But.these decisions go simply to the question of jurisdiction of prize courts — whether the, decree of a prize court sitting-in belligerent territory cm divest the title of the owners of a neutral vessel carried into a neutral port. They do not extend to the liability of the neutral nation which aids the captors and permits effect to be given to the decree. On that question, however, we have the utterance of Lord Stowell that a neutral nation “has nothing to do with the enforcement or consummation of such rights; it owes to both parties the simple rights of hospitalhy, and even these are very limited in the practice of most civilized states. By the regulations of France, foreign ships are forbidden to enter with prizes into a port of France except in cases of distress, and then they are permitted to stay no longer than their necessity exists. (4 Rob., 57.)
It seems, therefore, apparent to the court that in 1800 the Governments of Sweden and the Netherlands had allowed the right of asylum to be abused and extended beyond the limits *278 which should have regulated their conduct toward a friendly neutral nation, and that thej^ had also taken part in what Lord Stowell calls the “rights of force.” It is also apparent that by so doing they had violated the treaty obligations which they owed to the United States. The United States, therefore, had an international claim against each of them. The resulting question is whether that claim was relinquished, as in the case of Spain, and the United States elected to seek redress against France alone?
The first noticeable fact is that these claims of American citizens against Sweden and the Netherlands were never pressed by the United States. But, as was said in the case of the Leghorn Seizures (27 C. Cls. R., 224, 236), “great national considerations can not depend upon the rights or wrongs of individuals.” Sweden at one time was at the mercy of Napoleon, at another his ally, at another one of the allies fighting against him. Holland was intimidated by France, was conquered, and became for a time a part of the French Empire. The American Government, besides its troubles with France, had but just concluded a final treaty of peace with England, which was almost immediately followed b}'- wrongs and injuries, bringing before the country the probability and dangers of renewed hostilities, and resulting in the war of 1812. The affair of the Chesapeake and the Leopard took place at the beginning of 1807, and our troubles with the Barbary States began in 1801. It was a time when the rights of a few citizens to redress might, for the public welfare, bo ignored and sacrificed.
But the silence of the Secretary of State does not establish a presumption that the American Government elected to pass by the nation primarily liable and to hold France responsible. The Secretary was equalty silent as to France. There seems to have been a similar silence on the part of the diplomatic and consular representatives of the United States.
As against the Netherlands, the counsel for the defendants has cited the case of the ship America and the remonstrance made by the American minister at The Hague. On the 3d of March, 1798, he wrote to the secretary of foreign affairs of the Netherlands (then termed the Batavian Republic), stating that the ship had been seized by a French privateer and brought *279 into the Texel, and that she was then in the course of trial before the French consul at Amsterdam. He therefore requested an order for the delivery of the ship and cargo in the same condition she was in at the time of her arrival within the dominions of the Republic. He then wrote, and it is this which is relied upon by the counsel for the United States:
“He,'1 the American minister,- “ is silent respecting any order to the consulate of Franco of which he knows nothing-in this Republic. It is sufficient for him that a government exists here which controls everything within the Batavian dominions, and of course he can not know of any foreign jurisdiction reaching to the acts of high sovereignty within this Republic.”
‘ ‘As, however, cases similar to the above may unfortunately again occur, he is extremely solicitous to know the determination of the Government of this Republic upon the following-points, which he takes the libertj- of placing before you, citizen minister, for the decision of the directory, viz:
“Whether the Government of this Republic intends to permit any foreign consular tribunal to take cognizance of any prize causes in which neutral American, citizens are interested?” etc.
The general principle stated by the American minister is broad enough to include the cases we are now considering, but it nevertheless related to the specific cases of a French consular court sitting at Amsterdam, within the territory of the Netherlands, cases in which the American Government elected to hold Spain íesponsible; and the question propounded bjr the minister, “ Whether the Government of this Republic intends to permit any foreign consular tribunal to take cognizance of any prize causes,” in effect confines his remonstrance to cases in which a French consular court was sitting within the jurisdiction of the Republic.
As against Sweden, it appears that the American consul demanded the release of the Reliance from the governor of St. Bartholomew, basing his demands on the subsisting treaty between America and Sweden; and it also appears that the protest made, by the master was exclusively against the Government of Sweden. But this demand of the consul and the protest of the master were based on the fact that the vessel had been seized in Swedish waters “at the distance of about 1 mile from the south port of the before-mentioned island of *280 St. Bartholomew,” and not upon the fact that the vessel then in the Swedish port had been condemned, or was being condemned, by a French prize court sitting in French territory.
On these facts two opposite views of the question involved may be entertained by different minds: The first is, that where a nation has expressly agreed by treaty to protect the vessels of another nation within her ports, the treaty obligation is paramount and her liability primary, and not to be regarded as waived, except by some express election or concession, such as existed in the case of the Spanish claims. The second is, that the usage of nations was at the time changing with regard to the jurisdiction of prize courts where the prize was not within the territory of the belligerent, as is sufficiently evidenced by the opinions of Lord Stowell and Chief Justice Marshall hereinbefore quoted, and that, as the rulo was relaxing, the ideas concerning a neutral’s obligations were changing. But, more convincingly, it may be said that in the one class of cases concerning which the American Government spoke — the Spanish claims — it elected not to hold Spain respoi sible, and to regard France as alone responsible where the wrongful acts began upon the high seas, under the French flag, and were consummated by French authority in French territory; and that it would not comport with the honor of the American Government and the impartial justice which it owed toward different nations to decide now that where a number of treaties were substantiality the same, and the questions involved substantially identical, it intended to hold one friendly nation to a liability^ from which it discharged another.
The views last stated express the conclusion to which the court has come. What the United States expressly conceded to Spain they tacitly conceded to the other nations.
But this conclusion does not extend to such cases as that of the Reliance where a vessel was captured in Swedish waters, close to the shore, and was carried into a Swedish port, and protest and notification were made to the Swedish authorities, and nothing was done by them, but the seizure countenanced and the condemnation and divestiture of the owners’ title allowed. The case was a flagrant one from beginning to end, and Sweden was responsible for every act of the captors. *281 Concerning this responsibility there could not have been a doubt, either under the treaty or under the obligations of international law; and in the absence of an expressed intent by the American Government to waive the olfense, and to look to France for redress, it must beheld that Sweden alone was regarded as responsible. Such was the position taken by the United States against Spain, reiterated in the correspondence and the terms of the treaty.
In this case of the Reliance it should be noted that there is a conflict of evidence between the captors and the master of the vessel concerning the distance from shore at which the vessel was seized, the one averring that it was i leagues, and the other less than half a league. The protest of the master, however, and the action of the consul, and the claim filed by the owners in the Department of State constitute a fatal admission against the present claimant, and the court has no doubt of the verity of the protest. The conclusion of the court in that case is that the owners were not entitled to indemnity from France.
In the case of Happy Return, in which no such element existed, the conclusion of the court is that the owners were entitled to indemnity from France.
The findings and conclusion of the court in each of the above two cases will be reported to Congress, together with this opinion.