Peelle, Ch. J.,
delivered the opinion of the court:
The facts upon which the decision in this case is founded are set forth in finding x, the material substance of which is that after the Two Cousins had been captured by a French privateer the privateer was fired upon by a Spanish vessel of war, whereupon the prize crew ran the captured vessel *441 aground, and compelled her seamen to go on the boat with them, but the master refused and remained on the vessel. After the prize crew had cut away the fasts of the boat on deck, the standing aiid running rigging, and sunk the anchor they abandoned the vessel, with the American flag flying. The master resumed command and soon got the vessel off from being aground, when the Spanish war vessel came alongside and took the vessel in tow. The master of the American vessel tried to get his crew to come on board,'but they refused, and thereupon the Spanish vessel of war towed the Two Cousins to Habana. In the meantime the privateer proceeded to Cape Francois and obtained a condemnation of the vessel. The captor appeared in Habana and claimed the vessel so captured, insisting that he had not abandoned the vessel or lost sight thereof, and produced the decree of condemnation, whereupon the question as to which was entitled to the possession of the vdtsel, the master or the captor, was submitted to a Spanish court, who decided in favor of the captor, and the vessel and cargo were delivered to him and were subsequently sold and became a total loss.
The single question is, Which of the two nations, France or Spain, is primarily liable? The capture and condemnation of the vessel and cargo by the French were both illegal independently of the absence of the master and the vessel from the jurisdiction of the prize court at the time of condemnation. The taking of the vessel into the port of Ha-bana by the Spanish vessel of war was not an unfriendly act, especially as they had forced the French to abandon the vessel, and the master was unable to induce his crew to return. The controversy over the vessel- in the Spanish port was not as to the title of the vessel, but as to the possession thereof, which was clearly within the jurisdiction of the Spanish court.
Respecting this question Mr. Justice Story, in the case of The Tilton (5 Mason, 455), said:
“ Suits in admiralty, touching property in ships, are of two kinds — one called petitory suits, in which the mere title to the property is litigated and sought to be enforced independently of any possession which had previously accompanied or sanctioned that title; the other called possessory *442 suits, which seek to restore to the owner the possession of which he had been unjustly deprived when that possession has followed a legal title, or, as it is sometimes phrased, when there has been a possession under a claim of title with a constat of property. Until a comparatively recent period the court of admiralty .exercised undisturbed jurisdiction over both classes of cases, as upon principle it is still entitled to do. * * * No doubt exists that the admiralty possesses authority to decree restitution of ships wrongfully withheld from the owners. And if so, it ought to possess plenary jurisdiction over all the incidents.”
That questions of prize in general belong to the capturing power there can be no question, and this was the view of the court in the case of The L’Invincible (1 Wheat., 238).
In the case of the brig Alerta (9 Cranch, 359) a libel was filed in the district court at New Orleans by a Spanish subject, setting forth that he was the owner of the brig Alerta and cargo, and that while on a voyage from Africa to Ha-bana in 1810 he was captured by a French vessel and taken into the port of New Orleans. The libelant alleged that the French vessel was not commissioned to capture the property of Spanish subjects and that she was armed and equipped in the port of New Orleans by American citizens contrary to the law of nations. The prayer was for the restitution of the vessel with damages. The prize master admitted the capture of the Alerta as lawful prize of war and asserted that the French vessel at the time of the capture was legally authorized to capture all vessels and their cargoes belonging to the subjects of Spain as enemies to France; that after the capture he was compelled to enter the port of New Orleans by stress of weather, owing to the inability of the Alerta to keep the sea. The court below decreed restitution to the libelant of the ship and cargo, and that decree was affirmed by the Supreme Court.
And so in the case of the Amy Warwick (2 Sprague, 150), the court in substance held that a prize court could look be.yond the legal title and deal with the beneficial interests.
In the case of the schooner Mary, Thomas, master (2 Wheat., 122,129), the vessel, commanded by British subjects, was captured by the private armed schooner Cadet, an American vessel. The convoy under which the Mary sailed was in *443 sight of her at the time of her capture. The Cadet, however, came up to the Mary so suddenly that she had no opportunity to make resistance or give notice to the convoy of her danger. On the next day the Cadet and Mary being in company the Paul J ones, an armed brig bearing sails of English canvas pursued the Mary, firing at her. The prize master, being-convinced that it was an English cruiser, left the Mary for the shore after throwing over her anchor. . Within ten minutes after the prize crew had left the Mary the British master hoisted the English colors and steered the schooner toward the Paul Jones, and she was boarded bj^ a boat from the Paul Jones; and being.informed that the Mary was an English vessel the Paul Jones immediately stood off from the land, with the Mary in'company', with English colors flying.
Libels were filed against the Mary and her cargo in the district court for the district of Maine by the master in behalf of himself, the owners and crew of the Cadet, the caxitor, and the Mary was condemned; but on appeal the decree was reversed, the court saying:
“ We are of opinion that the facts stated in this appeal make a clear case of tortious dispossession on the part of the Paul J ones. The privateer Cadet had, with great gallantry, captured the Mary and been in possession of her half of a night and clay. The prize was close in upon the American coast and making for a port which was open before her. It was not until the superior sailing of the Paul Jones made it manifest that the prize must be cut off from this port, and until she had been repeatedly fired upon, that the prize crew abandoned her. There exists not a pretext in the case that this abandonment was voluntary, or would have taken place but for the hostile approach of the Paul Jones. Whether the vis major acted upon the force or the fears of the prize crew is immaterial, since actual dispossession ensued. * * *
“ We are of the opinion that the decisions of the circuit and district courts should be reversed; that the prize should be adjudged to the Cadet, and the case remanded for the assessment of reasonable damages in favor of the Cadet. But, considering that the prize arrived in safety, and probably in a more secure harbor than that for which she was sailing when seized by the Paul Jones (although it is certainly a case for damages), we are of opinion the damages should be moderate.”
*444 The facts in that case are quite similar to the facts in the present case. Here the dispossession of the French privateers by the Spanish armed vessel was clearly tortious as against France, but it was that tortious act against France that released the Two Cousins, and hence as against the United States was not tortious. Nor was the friendly act of towing the vessel to Habana a tortious act against the United States, especially as the vessel was without a crew, except her master.
As the Spanish court clearly had jurisdiction to determine the question of possession, such decision can not be held a tort, even though possession was restored to the captor. Had Spain permitted the captor to resume possession of the vessel and sail her out of the port of Habana without judicial determination such act would have been a violation of her treaty obligations with the United States to protect American vessels in Spanish waters, and a claim might then have arisen against Spain as a jointfeasor with France.
The Two Cousins having been captured by the French privateer in the open sea, the decision to restore the vessel to the captor was strictly within the rules of international law, as abandonment of a captured vessel can only take place by the voluntary act of the captor and without cause. Hence the forced abandonment of a vessel, as in the present case, can not be regarded as a desertion thereof by the captor, nor would a belligerent captor under such circumstances be deprived by a neutral of any rights they might have acquired by virtue of the capture. (The Mary, Thomas, supra.) In other words, in the language of the court in the case of McDonough v. Dannery (3 Dall., 188, 198), “ In determining the question of property, we think that immediately on the capture the captors acquired such a right as no neutral nation could justly impugn or destroy; and, consequently, we can not say that the abandonment of the Mary Ford, under the circumstances of this case, revived and restored the interest of the original British proprietors.”
We think the same rule may be applied in the present- case; France, through her privateer, having made the capture, the captor had plenary dominion over the captured property, and that right could not be diminished by the subsequent forcible *445 abandonment, even though the act of Spain be deemed a capture. (The Mary Thomas, supra, 1 C. Rob., 135, 189; The Cosmopolite, 3 C. Rob., 333.)
If the captor had abandoned the prize, Spain, when her vessel of war took possession, would have been entitled to salvage (McDonough, v. Dannery, supra), but Spain did not regard the vessel as a deserted one. On the contrary, the Spanish court held that the captor had not abandoned the vessel and was therefore entitled to possession. If the action of the Spanish vessel had been wrongful as against the Two Cousins, the master of the latter would have been entitled not only to restitution, but to damages under' the authorities heretofore cited, but no such claim was made. On the contrary, each party was required to pay the costs he had made and to share equally the costs made in common.
The capture of the vessel by the French privateer, being illegal, was a tort, and the forcible abandonment of the vessel can not be taken advantage of by France as a defense on the theory of the primary liability of Spain, Avho forced the abandonment, as the captor not only denied the abandonment, but persisted in claiming the vessel by procuring her condemnation in French territory and then relying upon that decree to secure both from the Spanish authorities and the master of the Two Cousins the release of the vessel. It is therefore clear that France could not set up by way of defense that because Spain is liable therefore France is exonerated.
Nor' can it be said that the facts of this case render Spain liable at all, unless she has made herself liable by subsequent treaties, and as to that let us examine.
By the treaty of August 11, 1802 (8 Stat. L., 198), a board of commissioners was provided for to receive all claims by the subjects and citizens of the respective nations claiming “ compensation for the losses, damages, or injuries sustained by them in consequence of the excesses committed by Spanish subjects on American citizens.”
That treaty was followed by the one of February 22,1819 (8 Stat. L., 252), by which Florida was ceded to the United States in consideration of $5,000,000, to be applied by the United States ■ in exonerating Spain from all demands in ■future on account of the claims of their citizens to which the *446 renunciations contained in the treaty extend, and by-the ninth article of said treaty the respective parties renounced “ all claims for damages or injuries which they, themselves, as well as their respective citizens and subjects, may* have suffered until the time of signing the treaty.”
On behalf of the United States it was provided therein that the renunciations should extend—
“ 1. To all the injuries mentioned in the convention of August 11, 1802, heretofore referred to.
“ 2. To all claims on account of prizes' made by French privateers, and condemned by French consuls, within the territory and jurisdiction of Spain.
“ 3. To all claims of indemnities on account of the suspension of the right of deposit at New Orleans in 1802.
“ 4. To all claims of citizens of the United States upon the Government of Spain, arising from the unlawful seizures at sea, and in the ports and territories of Spain, or the Spanish colonies.
“ 5. To all claims of citizens of the United States upon the Spanish Government, statements of which, soliciting the interposition of the_ Government of the United States, have been presented to the Department of State, or to the minister of the United States in Spain, since the date of the convention of 1802 and until the signature of this treaty.”
No “ losses, damages, or injuries ” were sustained by the claimants herein by reason of excesses committed by Spanish subjects under the treaty of 1802.
Nor did the claim herein arise under the second or third class mentioned in the treaty of 1819, or under the 'fourth class, as the forcible dispossession of the captor followed by towing the Two Cousins into Habana was not a wrongful seizure at sea. The claim does not fall within the fifth class, as it is not shown that the claim was presented to the State Department as therein provided as a claim against Spain prior to the signing of the treaty of 1819.
But the defendants contend that because the claim was presented to the commissioners appointed under the treaty of 1819, therefore the claimants elected to look to Spain and by that act released France.
The claim herein was not a claim against Spain, either separately or jointly, and therefore did not .fall within the class of claims renounced by the United States. Hence its *447 presentation to the commissioners under the treaty of 1819 did not operate as an election, as an election in such-a case presupposes a joint liability. France was alone liable for the illegal capture and condemnation, and continued to persist in her wrongful act, and therefore the filing of the claim before the commissioners under the treaty of 1819 and its disallowance because of insufficient testimony can' not avail as a defense to France and therefore not to the United States.
Where one has inconsistent rights or remedies of which he may avail himself, a choice of one is held an election not to pursue the other, but that rule does not apply to coexisting and consistent remedies. (F. C. Austin Mfg. Co. v. Decker, 80 N. Y., 8; N. Y. Land Improvement Co. v. Chapman, 118 N. Y., 288.)
But here the question is not one of inconsistent remedies or rights against the same party, but whether two nations are liable as joint tort feasors for unlawful captures of American vessels or whether Spain is liable separately for the loss of the Two Cousins and her cargo by reason of excesses committed by Spanish subjects on American citizens. As Spain is not shown to have aided France in any unlawful way, she can not be charged with joint liability therewith, and as the act of Spain was not unlawful as against the United States, no separate liability arose against her in favor of the claimants ; and hence the filing of a claim against Spain under the treaty of 1819, under the circumstances of this case, did not operate as ah election releasing France. ‘
In the case of the Reliance (37 C. Cls. R., 262), where the vessel was seized in Swedish waters and carried into a Swedish port, and while there condemned by a French court sitting-in French territory, the court held, on the motion for a new trial (41 C. Cls. R., 67), that the United States had the right to present the claim either to Sweden, who owed protection to the American vessel, or to France, who seized the vessel; and, further, that the owners had the right to ask their government to prosecute the claim against either one or the other offending parties; and, having filed the claim in the State Department, requesting the United States to ask satisfaction from the Swedish Government, it was an election, so far as *448 the owners of the vessel could make it, to hold the Swedish Government; and that being true, it was not one of the claims relinquished by France in consideration of the relinquishment of France of her claims against the United States.
In that case the seizure was in Swedish waters, and, therefore, Sweden by not protecting the vessel violated her treaty with the United States, which rendered her a tortfeasor with France, if not primarily liable, and hence the owners by electing to look to Sweden, it was held, thereby relinquished their claims against France.
In the present case, as the claim was never one against Spain, either separately or jointly, but arose by reason of the illegal capture and condemnation by France, it ivas one of the claims released by the second article of the treaty of 1800 in consideration of the "release by France of certain claims of her citizens against the United States.
Spain being a neutral her wrong was against France, which she judicially recognized by decreeing' possession of the vessel to the captor. That is to say, the status quo of the captured vessel was restored to the captor, and no damages were claimed by the master of the Two Cousins against Spain for her acts.
Even if the master of the privateer had directed the prize master to take the captured vessel into a Spanish port it would not have been an illegal act (The Hiram, 41 C. Cls. R., 12). If not, and while there a controversy had arisen as to who was entitled to the possession of the captured vessel, the courts of Spain would have been open to adjudicate that question. Nor would Spain have rendered herself liable by permitting the sale of an American vessel under a decree of a prize court sitting in French territory (Ship Star, 35 C. Cls., R., 387).
Respecting the insurance on the vessel effected subsequent to the capture, the court in the case of the schooner John Eason (37 C. Cls. R., 443) held that where the captured vessel had been insured after its condemnation, the premium therefore was not a charge against France, as the liability of France was limited to the value of the property at the time of the illegal seizure or condemnation. In that case the in *449 surance was effected, after the condemnation, while in the present case the insurance was effected before the condemnation but after the illegal seizure, and we think that the same principle applies, as the liability of France could not be augmented subsequent to the illegal seizure, though the insurance between the parties was valid.
The court’s conclusions are that the claimants are entitled to the allowance set forth in the findings, which findings together with this opinion, will be certified to Congress.