Howrt, Judge,
delivered the opinion of the court:
On the findings the resulting question is whether after the original capture of this neutral by the French privateer and the subsequent taking of the ship by the authorities of the Batavian Republic under the guns of one of its forts and the bringing of the neutral to an anchor and landing the cargo on Dutch soil, and selling the property, the United States had any claim or relinquished their.claim against France.
There was no decree of condemnation prior to the sale, but afterwards the vessel and car go. were condemned as good prize by a commercial tribunal sitting at Basseterre, Guadeloupe, on facts which proved to the condemning tribunal a false destination. The vessel appears to have been delivered after the sale by the Dutch authorities to her former master, who was empowered by the purchaser to take the schooner back to her home port, there to be disposed of according to orders. What the orders were is not disclosed. No bill of sale or other document disposing of the vessel is produced. The former owner seems to have repossessed himself of the vessel and reregistered her.
At the time the vessel was ordered into the island of St. Eustatius by the Dutch there existed a treaty between the Netherlands (afterwards the Batavian Republic) and the United States by which each country agreed to “ endeavor, by all means in their power, to defend and protect the ves- *396 seis and. other effects belonging to their subjects and inhabitants, respectively, or to any of them, in their ports, roads, havens, internal seas, passes, rivers, and as far as their jurisdiction extends at sea, and to recover and cause to be restored to the true proprietors, their agents or attorneys, all such vessels and effects which shall be taken under this jurisdiction.” 8 Stats., 34.
It was a clear violation of her treaty obligations for the Batavian Republic to refuse to protect the neutral ship. The right of asylum was grossly abused by the sale of the property and also by the detention of the master as a prisoner. The Government in possession of the recaptured vessel was under its treaty a temporary keeper of the property for the benefit of the neutral, because the privateer had been deprived of control and was as much subject to the orders of the Batavians as the master and crew of the neutral. Direct responsibility resting upon the Batavians, our duty is to decide the matter of liability assumed by the United States of whatever French liability there was under the jurisdictional act of 1855.
In an essential particular this case differs from the Star, Burchmore, 35 C. Cls., 387, in that there the vessel was sold under a decree of condemnation, whereas in the present controversy there was a sale with no authority for it except the will of the Government possessed of the property. If the privateersman profited by the sale (of which there is no proof), nevertheless they did so in active cooperation with the Batavian authorities. If France was liable at all, that Government was not primarily liable, but only secondarily bound. But there is no proof that the privateersmen were directly responsible for the sale or that they took any profit from the proceeds. In whatsoever happened France as a nation had no direct part.
The court has decided in the case of the Eagle, Goodhue, H. Doc. 369, 2d sess., 59th Cong., that the claim under similar circumstances was against Holland and not against France. In the Eagle it appears that the vessel was captured by a French privateer in July, 1798, and taken to Curacoa, where a guard of Dutch soldiers was put on *397 board. The master demanded of tbe Dutch governor that the vessel and cargo be given up to him by virtue of the treaty between Holland and the United States, but the master received no satisfaction and the vessel and cargo were sold at Curacoa. After nearly a year condemnation was had at Guadeloupe. Thus, the condemnation proceedings had nothing to operate upon. That presents facts similar to this case.
In the present case the prize crew of the privateer was proceeding to Guadeloupe with no intention of maldng any other port. When off the Dutch island of St. Eustatius the captor and captured were brought to by the Dutch fort, a boat was sent from shore, and the captured property brought to anchor. The cargo was landed, and six days thereafter the vessel was sold presumably by the Dutch authorities before any condemnation was had by the French. There is no proof that the French maintained a vendue master at the alien port. Sales of vessels and cargoes in alien ports were conducted by the local officials. The vendue master is certified to as being “ of the Republic.” Batavia was a Republic as well as France. That the sale was by an official of the Batavian Republic is made clear by the master, who protests against the proceedings of the commander and crew of the privateer, but “ also against the proceedings of the Government in selling said schooner Experiment?' This protest was made before the captain commandant of the island. Of necessity, it was against the Batavian Republic that the master protested. No other Government was or could have been cognizant of the sale. The French had taken no action looking to the sale of the property up to that time, and doubtless were ignorant of the seizure, for it was not until 11 days after the sale that the farcical condemnation was had at Guadeloupe. The decree of the tribunal in Guadeloupe could not have operated upon the title after another Government had sold the property and appropriated the proceeds. The subsequent decree in the French port of Guadeloupe had no extraterritorial effect. It was the positive acts of the Dutch which operated to divest the neutral not only of the possession but likewise of the title to his *398 property. When we consider that on the recapture of the neutral American from the French privateer the new captors might have claimed salvage, and in that case (assuming salvage could have been claimed) there would have been no liability against anybody had they restored the ship, less the salvage, to the American owner. Had the Batavians stopped with a claim for salvage no liability could have arisen against the Batavian Republic.
It was pointed out by this, court that the claims of American citizens against the Netherlands (Batavian Republic) were never pressed. Brig. Happy Return, schr. Reliance, 37 C. Cls., 262. But that affects neither the validity of the claims against the nation violating treaty rights nor the liability of the same nation for the payment of the claims of our citizens.
In the Leghorn Seizures, 27 C. Cls., 224, it was said “ that great national considerations can not depend upon the rights or wrongs of individuals.”
In the Tom, 29 C. Cls., 68, this court also said that “not all spoliation claims were so (by treaty of 1800) relinquished to France. Some were provided for, or intended to be provided for, by that or other treaties; some were exceptional claims abandoned, intentionally or unintentionally, in the diplomatic vicissitudes of the times.”
Construing the liability of other nations to be the same as that of Spain under our treaty, it was said by this court in the Happy Return, supra, that “in the one class of cases concerning which the American Government spoke — the Spanish claims — it elected not to hold Spain responsible, and to. regard France alone responsible where the wrongful acts began on the high seas under the French flag and were consummated by French authorities in French territory; and that it would not comport with the honor of the American Government and the impartial justice which it owed toward different nations to decide now that where a number of treaties were substantially the same, and the questions involved substantially identical, it intended to hold one friendly nation to a liability from which it discharged another.”
The Experiment, Maxwell, does not appear to have been mentioned in any list of claims against either Holland or *399 France. If we give effect to the views of the court as expressed by Nott, C. J., in the Happy Return, supra, it would not comport with our honor and the impartial justice which we owed to different nations to decide now that the Batavian Republic violated her treaty obligations in selling this American property, and that we intended to hold another nation, not responsible for the sale, liable while discharging the liability of the Government directly responsible.
One of the class of cases rejected by the commission to carry into effect the provisions of article 9 of the treaty of 1819 with Spain was that of captures made by French privateers where the prizes were carried within the territory and jurisdiction of Spain, and although not considered by any tribunal then existing, were nevertheless there disposed of by the captors. 5 Moore’s Int. Arb., p. 4514. The commission to which allusion is made discussed this class of cases, so interpreting the treaty of 1195 in its relations to them that—
“ the vessels and effects of the citizens or subjects of either of the contracting parties captured juri belli by the cruisers of any third nation were to be protected and defended while they continued to be within the territories of the other; but the captor might leave the territory to which he had resorted whenever he saw fit, taking with him his prize, even before its condemnation anywhere. And if this was condemned by any competent tribunal before it left such territory, it thereupon ceased to belong to its former owner, whose rights being extinguished by such condemnation, the casus foederis then ceased to exist and the obligation to apply.” •
This interpretation of the treaty of 1795 induced the commission to reject all cases of French captures where the prizes were carried within Spanish territory in which there existed regular French condemnations by competent tribunals within the French territory, and where no act was done or suffered by Spain prior to such condemnations contrary to her obligations to protect and defend the property while it continued American once within her jurisdiction. 5 Moore’s Int. Arb., pp. 4514-4515.
Accordingly, Spain was held by the commission to be exonerated for such acts of a permissive character only as stated, but liable for her own aggressions and usurpations *400 and for permitting France to exercise sovereignty within the territorial limits of Spanish sovereignty.
By that rule in the present case Spain would have been liable where she had asserted her sovereignty and by force had voluntarily compelled the entry of a vessel into one of her ports, and by her agents and officials sold the neutral and thus divested the American owner of his title by extinguishing rights before any condemnation had been had. This kind of a case would have presented a flagrant violation of the treaty of 1795 with Spain, as well as a violation of the law of nations.
A few of the cases against Spain allowed by the commission, stated with amounts, illustrate the construction of the treaties of 1795 and 1819. S. Doc. 74, 49th Cong., 1st. sess.
The brig Betsey, Bunce, was captured by a French privateer in 1799, carried to Porto Eico, where immediately after its arrival the cargo was landed and sold by the captors under the inspection of the Spanish officials, and its proceeds, together with the vessel, suffered to be appropriated by them to their own use. MSS. report.
The schooner Sally, Downe, was captured by a French privateer March 1, 1799, carried to St. John, P. B., and there, notwithstanding the application of the master to the Spanish authorities to prevent it, the captors were suffered to land and dispose of the cargo for their own benefit, and this without formal trial whatsoever. MSS. report. This vessel was afterwards condemned at Guadeloupe on 5 Nivose, year 8 (December 25, 1799) (Tuck’s report), and was disallowed by the Court of Claims as against France March 31, 1902. H. Doc. 126, 2d sess., 59th Cong.
The schooner Brothers, Fairfield, was captured by a French privateer December 31, 1799, and carried to Matanzas. Same proceeding as in the Bally, MSS. report. This vessel was afterwards condemned at Guadeloupe on 25 Germinal, year 8 (April 14, 1800). Tuck’s report. This case against France has been dismissed by the Court of Claims for want of prosecution.
The ship Pattern, Nash, was captured in 1797 by a French privateer, carried to St. John, P. B., and acquitted by the French tribunal at San Domingo. The Spanish authorities *401 refused to restore the property, and suffered the captors to retain it until they procured a fraudulent condemnation at Guadeloupe.
The ship Success, Gordon, was captured by a French privateer and carried to Acquidilla, P. R.., where the property was sold by the Spanish authorities and the proceeds paid to the agent of the captors, from whom (notwithstanding a decree of restitution rendered at Guadeloupe) the owners were never afterwards able to obtain them.
The sloop Commerce, Bentwell, was captured by a French privateer in 1798 and carried to Campeachy, there seized and sold by the Spanish authorities, and the proceeds deposited in the Treasury and lost to the owners. MSS. report.
The ship Edward, Warner, was captured by French privateers, carried to Barracoa, Cuba, where, notwithstanding the application of the master to the Spanish authorities to prevent it, the captors were suffered to land and dispose of the cargo for their own benefit, and this before any trial. MSS. report.
“ MSS. report ” is the manuscript report of allowances of the commission of 1819, and “Tuck’s report” is House Document No. 809, second session Fiftieth Congress.
Clay’s report, H. Doc. 68, 2d sess. 19th Cong., lists diplomatic claims against France, Naples, Denmark, and Holland arising subsequent to the year 1805. There is an appendix to that report which contains a list of claims arising prior to 1805, of which three are against Holland, accruing in 1798, 1800, and 1804, respectively.
The ship Mary, Phillips, was one of these last-mentioned claims. She was captured in 1800 by a French privateer and carried to the Dutch island of Curacoa, turned over to the fiscal of the island, and a guard of Dutch soldiers put on board. The Government ordered that the cargo be unloaded and the vessel sold at public vendue and the proceeds to remain in the custody of the Government subject to the order of those to whom it might be adjudged to belong. Restitution was claimed from Holland, without success. This case was presented to the Court of Claims, which on November 11,1907, held it to be a claim against Holland *402 and not against France, on tbe authority of the Reliance and the Eagle, Goodhue, supra. H. Doc. 282, 2d. sess. 61st Cong.
The pursuit of a remedy against one joint tort feasor does not usually operate to release another joint tort feasor. The injured party may have as many actions as there are trespassers, but he can have only one satisfaction for the injury.
But this was originally a diplomatic claim against a foreign Government. There is no sort of doubt to express that the Batavian Republic was the Government immediately and directly responsible, for the obvious reason that the property was sold on Dutch soil in advance of any action taken by France. Whether the vendue master was of one Republic or the other is immaterial, inasmuch as title could neither be extinguished nor transferred by a subordinate acting without the authority of the law of his country. A decree of the French court subsequently made being inoperative on the res necessarily had no effect upon the matter of title, which had been disposed of by either the active instrumentality of the Batavians or by their permission. That is this case.
There is a close analogy between the present case and those known as the Leghorn Seizures, 27 C. Cls., 224. There it appeared that war existed between France and Austria. Napoleon entered the neutral territory of Tuscany and seized property belonging to Americans. The claims were never pressed by the United States against either France or Tuscany. Our citizen owners subsequently appeared before the board of commissioners under our treaty with France of 1803 as creditors and presented their demands as debts against the French. This court held that when our American citizens carried goods into a foreign port the obligation of our Government arose to see to it that they received from the Government of the foreign port the measure of protection which that foreign Government accorded to their own citizens. Tuscany at the time of these seizures was neutral territory. Though, when the seizures were made, assurances of payment were given on the part of France, this court held that the claims relinquished to France by *403 the treaty of 1800 did not include claims for land captures on neutral territory.
Upon the findings the court concludes that liability for the loss of this vessel has never been established against France. No claim was ever made upon France for the loss. No demand of any kind appeared until after the passage of the jurisdictional act of 1885, under which this case is now decided. It would be unjust to hold that France was liable when the property was sold and the proceeds presumably were confiscated by another Government. As a consequence of these views there can be no award against our own Government for the want of liability on the part of France.
The findings and conclusions of the court will be transmitted to Congress, together with a copy of this opinion.