Howry, J.,
delivered the opinion of the court.
This is a salvage case alleged to be founded upon the act of January 20,1885 (23 Stats. L., 283).
It appears that the ship Hiram, Whitney, master, sailed on a commercial voyage on or .about December 7, 1798, from Castine, Mass., bound for Liverpool. While peacefully pursuing her voyage she was seized on the high seas in January, 1799, by the French privateer La Vengeance, Capt. Jean Limousin. A prize master and crew were placed on board of her with orders to conduct her to a port of France or one *15 of France’s allies, qualified by the further direction that if the prize master should find himself forced to put in any ports of Spain he was to choose the port of passage. The prize master was steering the vessel toward the coast of Spain when on the day of the capture he was recaptured by the British and taken into the port of Plymouth, England. Proceedings were thereupon instituted by a libel for salvage in the High Court of Admiralty of England, and a decree was rendered directing- restoration upon the payment of one-eighth of the clear value as salvage.
Decided adversely to the claimant by the Court of Claims May 25, 1903, because the neutrality of the cargo did not appear ; the decision of this court was followed by a motion on behalf of the claimant to amend the findings and by a further motion to grant a new trial.
The motion to amend is allowed to the extent of'showing by the competent evidence in the case the nature of the papers on board the ship at the time of the capture; This has been supplemented by other evidence showing the exact occurrences at the time of the seizure and recapture. The alleged error of law remains to be considered on the facts as now fully stated.
' The first question is that which pertains to the seizure, and is fundamental. It is whether the American owner had a valid diplomatic claim against France at the time of the ratification of the treaty of 1800 under the circumstances disclosed by the findings.
The same defenses which were available to France at the time of the capture likewise became available to the United States upon the assumption by this Government of whatever liability there was existing against France when the treaty released France.
The right of search being preliminary to the right of seizure, and the seizure depending upon the result of the search, we are immediately concerned with the occurrences which resulted from the search and the purpose to have the vessel examined by the French tribunals. Neither search nor seizure were necessarily illegal, because the presumption in such cases is that the right of search, followed by seizure, were rights legally exercised. The burden rests upon the *16 neutral vessel to show that the captor’s rights were improperly exercised in the determination to have the vessel examined by the tribunals provided for the purpose in France.
With these principles in view, which have had frequent application in spoliation cases, we find that the ship had a passport, a register, and manifest of cargo. The latter was apparently in duplicate. By comparison of date of sailing and date of register it is reasonably certain that the paper called “ certificate of property ” was the register. There was no bill of lading, on board. The shipowner claimed that there was an invoice, and this apparently was contained in the small paper referred to by the prize captain in his report of the proceedings. It is reasonably certain that this small paper was the duplicate of an original which was wholly deficient. The paper purporting to be an invoice, but which was wanting in those particulars usually accompanying every invoice of goods, either in a consignment to a factor for sale or in a shipment in the case of a purchase to a purchaser, does not seem to have been delivered to the captors.
The manifest being merely a declaration of "general character and a summary of what the cargo consisted without showing the particulars, and no bill of lading or other satisfactory evidence being submitted to the privateer, it is thus made to appear that there.were reasonable grounds for the detention. The captured ship was sailing to a belligerent port and not to her own country or to the country of a neutral. The vessel was going to Liverpool, and it was reasonable to suppose that the consignee was an Englishman, a subject of a country belligerent to France. None of the papers on board showed the cargo to be the property of the owner of the vessel, and there is every presumption of enemy interests. The. seizure was lawful.
The next question is subordinate, but no less important to the rights of the parties. This arises out of the contention that illegality is shown to have existed in the course the privateer took in sending the captured vessel in the direction of Spain. Did this work a forfeiture of the right of detention?
*17 It is not clear that the vessel was going to Spain. It can not be’saicl that such was the case from the fact that at the time of the recapture, on the same day of the original capture, the vessel was going to Spain merely because she was heading in that direction. Under the orders given to the prize master to direct his route -to the best of his ability to the port of Bordeaux, or to any other port of France, or her allies, which was accompanied with the further direction that if forced to put into port in Spain the prize master was to choose the port of passage, the heading of tlie vessel at the time of the capture being in the direction of Spain must be taken to mean that the prize master was endeavoring to save his prize from the very thing that happened to him, despite his caution. The captured vessel stood just off the English Channel, where she was liable to recapture, and it is fairly deducible from the proof that the master was seeking a port in his own country ‘if he could get there. It is as fair to say this as to say the vessel was bound for Spain.
There was nothing objectionable in the order as it was given and nothing in the mere fact that the vessel seemed to be standing in the direction of another country, -which certainly renders the action of the prize master so illegal as to work a. forfeiture of the rights of his country. In the order that was given by the master of the privateer, in one of the most remarkable documents that has come under our notice (because it evinces a clear under.standing not only of his country’s rights but of his duties as the privateer’s master), we can see nothing which does not evince a due re-regard for the rights of the captured vessel under the rules which govern all nations in protecting themselves against belligerent enemies and those presumably cooperating with them.
But it is earnestly contended that some effect should be given to a different version of the circumstances of the seizure arising after the recapture of the vessel. The admissibility of an alleged decree rendered by the High Court of Admiralty of England is the bone of contention.'
We can not consider this decree. Its admissibility as competent evidence must be denied because it was an exparte pro *18 ceeding so far as France was concerned. There was no opportunity given for cross-examination or defense of any kind when the claim for salvage was under consideration in the admiralty court in England. France was without notice of this claim for salvage. It does not even appear (though it does not seem necessary that it should appear to exclude the decree) that the French prize master was examined on interrogatories. The decree can only be considered as affording some criterion to measure damages. (Schooner Nancy, 37 C. Cls. R., 411.)
It is true that under the provisions of the act giving this court jurisdiction to ascertain the claims of our citizens for the spoliations of that period, it is provided that in the course of our proceedings the court shall receive all suitable testimony on oath or affirmation, and all other proper evidence, historic and documentary, concerning the same. And under this provision the court has received as evidence many contemporaneous statements and documents. But it is also provided that this court shall decide upon the validity of these claims according to the rules of law, municipal and international, and the treaties of the United States applicable to the same.
There is no rule of international law or of any other law which in our judgment makes the decree of this English court admissible; and it would be a remarkable state of affairs for any legislative body to prescribe and for any court to decide prize rights without the application of those rules of international law which from time immemorial civilized nations have invoked and have had applied in the consideration of claims arising out of the assertion of belligerent rights in time of war. Congress did not attempt to supersede the law of nations, and the responsibility of these defendants being measured by the liability of France, and no competent evidence being shown from which the liability of France has been established, no liability attaches to the United States for this claim under the treaty of September 30, 1800.
The conclusions of the court will be reported to Congress, together with a copy of this opinion.