Booth, J.,
delivered the opinion of the court.
The brig Philanthropist, Bichardson, master, sailed on a commercial voyage from Alexandria, Va., May 2, 1799, bound for Laguira. While peacefully pursuing said voyage she was seized on the high seas' by the French privateer Hipolite, Denillard, commander, May 30, 1799. A prize master and crew were placed on board her, and the prize started for Vigo, Spain. On July 3, 1799, the English frigate Cerberus, Capt. James McNamara, recaptured the Philanthropist and carried her into Plymouth, England, where the High Court of Admiralty of England condemned the vessel and cargo to pay one-eighth of the clear value thereof as salvage.
The recovery here sought is for the salvage paid, and the difficulty encountered respects the competency of the evidence relied upon to establish the ownership of vessel and *154 cargo. The protest of the mate made at Plymouth, England, recites in detail the circumstances of the seizure and recapture, but omits any statement as to ownership of vessel and cargo. The manifest of cargo discloses the amount and character of the same, but not the ownership. Two unsigned bills of lading, coming from the archives of the English admiralty court, together with verified copies of the proceedings had by said prize tribunal, in which ownership of vessel and cargo are stated, constitute the record in the case.
Defendants concede the competency of the protest of the mate and the manifest of cargo, but challenge the admissibility of the proceedings of the English admiralty court, resting their case on the decisions of -this court in the schooner Nancy (37 C. Cls., 411) and ship Hiram (41 C. Cls., 12).
There is a slight distinction as to the facts between this ease and the cases relied upon by the defendants, but not such a variance as would warrant a departure from the former rulings of the court. In the schooner Nancy, supra, effect was given the decree of the English admiralty court to the extent of the amount only of salvage paid. It was admitted for no other purpose, for the illegality of seizure and search, as well as ownership of vessel and cargo, appeared in the case by evidence aliunde the record of the English admiralty court. The protest of the mate in this case establishes *a flagrant violation of international law in the fact that subsequent to seizure and search (a belligerent right) the prize crew plundered her cargo, deprived the owner of certain portions thereof, and otherwise perverted a conceded international right into an apparent wrong and injury, and if the ownership of vessel and cargo was established, France (now the United States) would be liable therefor; but, as well said in the defendants’ brief, this unlawful act of the prize master does not per se make incompetent evidence competent. If the brig had not been recaptured by the English frigate, and had been carried by the Hipolite into a French port and proceedings for her condemnation instituted before a French prize tribunal, the illegality of her seizure could have been established by *155 the evidence in this record, but the ownership of the vessel and cargo, and hence the identity of the persons damaged, would necessarily have failed, for the proof thereof is found only in an ex parte examination of the mate, elicited in response to certain interrogatories propounded by the English admiralty court.
The proceedings of the High Court of Admiralty of England obtained in this case from London consist, among other things, of an extensive examination of the mate of the brig Philanthropist in preparatorio by propounding to him thirty-two interrogatories relative to ownership of cargo, capture, recapture, etc. In answer to the ninth interrogatory the mate avows ownership in the decedents Thompson & Veitch. Nowhere else in the record is to be found evidence of owership of brig and cargo. The register of the vessel is not available, and no secondary evidence of its existence produced.
While under the jurisdictional act of January 20, 1885 (23 Stats., 283), contemporaneous statements and documents have been received as evidence, the court has never extended the rule so as to embrace the admissibility of papers other than those recognized as competent by the rules of law, municipal and international, and the treaties applicable to the case. The proceedings of the High Court of Admiralty of England have uniformly been refused admission. No opportunity was given France to cross-examine the deponents in .preparatorio, and she could not avail herself of any defense she might have had in the English court. She was without notice of the claim for salvage, and in so far as she was concerned the proceedings were ex parte. This court in the case of the ship Hiram, supra, in denying a contention somewhat similar to this, used this language:
“ But it is earnestly contended that some effect should be given to a different version of the circumstances of the seizure arising after the recapture of the vessel. The admissibility of an alleged decree rendered by the High Court of Admiralty of England is the bone of contention.
“We can not consider this decree. Its admissibility as competent evidence must be denied because it was an esc parte proceeding so far as Francé was concerned. There was no opportunity given for cross-examination or defense *156 of any kind when the claim for salvage was under consideration in the admiralty court in England. France was without notice of this claim for salvage. It does not even appear (though it does not seem necessary that it should' appear to exclude the decree) that the.French prize master was examined on interrogatories. The decree can only be considered as affording some criterion to measure damages. (Schooner Nancy, 37 C. Cls. R., 411.)
$ * * * *
“There is no rule of international law or of any other law which in our judgment makes the decree of this English court admissible; and it would be a remarkable state of affairs for any legislative body to prescribe and for any court to decide prize rights without the application of those rules of international law which from time immemorial civilized nations have invoked and have had applied in the consideration of claims arising out of the assertion of belligerent rights in time of war. Congress did not attempt to supersede the law of nations, and the responsibility of these defendants being measured by the liability of France, and no competent evidence being shown from which the liability of France has been established, no liability attaches to the United States for this claim under the treaty of September 30, 1800.”
It is, however, most vigorously asserted that the illegal exercise of the right of seizure and search by France, as established by the competent evidence, estops the offending nation from questioning or disputing the records of the English court. Where would this doctrine carry us? The right of seizure and search, a conceded belligerent right, was coextensive with the correlative right to carry the neutral vessel seized into a French port for examination before a prize tribunal if the cargo was suspicious or the documentation irregular. English vessels on the high seas rescued American vessels from French privateers irrespective of their guilt or innocence as to a violation of the laws of neutrality, and for this rescue were entitled to salvage. The English admiralty court ivas alone concerned under these .circumstances with the question of salvage. The proceedings were m rem,, and the satisfaction of salvage decreed was assured by a lien upon the vessel and cargo, the res being in court and available for the purpose. If the ex parte statements of persons whose interests were manifestly in *157 imical to France and clearly interested in charging her with liability for the salvage paid are to be admitted as competent evidence for any purpose, it is indeed difficult to see how a salvage case could possibly arise wherein France eoiild escape a decree against her.
France, notwithstanding an illegal decree of condemnation or an unlawful exercise of the belligerent right of seizure and search, is entitled to a conclusive record in a subsequent proceeding wherein she is held to respond in damages for her conduct, which in itself will, serve as a conclusive acquittance when satisfied by payment of the same. Payment to others than the real parties in interest does not operate to discharge the liability, and it is indispensable that they be identified by competent evidence in the record. The United States having assumed the obligations of France under the treaty of September 30, 1800, its liability is measured by that of France.
The doctrine of estoppel is inapplicable to the case. The conduct of the privateer is nowhere shown to have prevented the claimants from proving ownership of cargo and vessel in the regular and accustomed way. Assuredly it did not mislead or prevent the mate from including a statement as to ownership of vessel and cargo in his protest, a document coming from the Treasury Department and admittedly competent. Nothing was done by the French tending to cause the master and owners of the neutral vessel to omit a proper authentification of the bills of lading. These last papers were American documents and might have been shown in the mate’s protest to have been aboard the vessel at the time of capture and intact -when presented to the English admiralty court. It is not shown that the prize master made way with the register of the vessel or the invoice of cargo. In Pickard v. Seers (6 A. & E., 469) it was .said by Lord Denman:
“ Where one by his words or conduct willfully causes another to believe the existence of a certain state of things and induces him to act on that belief so as to alter his previous position, the former is concluded from averring against the latter a different state of things as existing at the time.” (Schooner Betsey. 44 C. Cls., 513.)
*158 Certainly the plundering and theft of a portion of the cargo would not exempt the owners thereof from proving by direct and competent evidence that they were the real sufferers and entitled to damages therefor. France is likewise entitled to know this fact, and certainly entitled by everjr known rule of evidence to cross-examine a witness who makes such a statement, that the offending nation, admitting guilt, may nevertheless assure itself that the right parties have been indemnified. France is alone responsible for her infractions of the laws of the sea to the owners of neutral vessels and cargoes. The manner, of establishing ownership is well known and well defined, and the commission of an unlawful act affords no foundation upon which to rest the introduction of secondary evidence where it does not appear that the conduct of the captor effectually forestalled resort to the well-established methods of producing evidence.
The findings of fact and conclusions of law, together with a copy of this opinion, will be certified to Congress.